[No. 48444-9.   En Banc.   September 8, 1983.]

JOHN H. MACIAS, ET AL, *Appellants,* v. THE DEPARTMENT
OF LABOR AND INDUSTRIES, *Respondent.*

*William L. Halpin* and *Fred A. Horning,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *John D. Fairley, Assistant,* for respondent.

*Antonio Salazar* and *Steve Scott,* amici curiae for appellants.

[As amended by order of the Supreme Court October 5, 1983.]

ROSELLINI, J.—Appellants, John Macias, Trinidad Salinas and Frederico Mendoza, challenge the constitutionality of their exclusion from workers' compensation. We hold that the $150 exclusion for seasonal workers contained in RCW 51.12.020(6) is unconstitutional and reverse.

Appellants are migrant workers who were injured during the course of their employment. John Macias, a 75–year–old man, sustained serious injury when he fell from a ladder while picking cherries. Trinidad Salinas was injured while climbing down from a truck bed during the hop harvest. Frederico Mendoza likewise was injured while working.

Each of these plaintiffs was injured prior to earning $150 from the farmer for whom he was working. Respondent, Department of Labor and Industries (Department), denied appellants' claims relying on the provisions of RCW 51.12-.020(6). That statute excludes

Any employee, not regularly and continuously employed by the employer in agricultural labor, whose cash remuneration paid by or due from any one employer in that calendar year for agricultural labor is less than one hundred fifty dollars. Employees not regularly and continuously employed in agricultural labor by any one employer but who are employed in agricultural labor on a seasonal basis shall come under the coverage of this title only when their cash remuneration paid or due in that calendar year exceeds one hundred fifty dollars but only

as of the occurrence of that event and only as to their work for that employer.

Appellants sought review before the Board of Industrial Insurance Appeals (Board), arguing that the statute unconstitutionally denied them equal protection of the law. The hearing examiner ruled that he did not have jurisdiction to determine the constitutional question and affirmed the Department's denial of benefits. Petitions for review filed with the Board were also denied.

Appellants next filed suit in the Superior Court for Yakima County seeking a declaratory judgment that RCW 51.12.020(6) was unconstitutional. As appellants also filed an administrative appeal before the court, the actions were consolidated. Following oral argument on a stipulated record, the trial court ruled that the statute did not violate either the claimants' right to equal protection under the fourteenth amendment to the United States Constitution[1] or the Washington Constitution's privileges and immunities clause, article 1, section 12.[2] We granted direct review to resolve these issues of first impression.

I

The workers' compensation act, RCW Title 51, creates a system of insurance designed to compensate workers for injuries incurred during the course of their employment. Prior to 1971, no agricultural workers were covered by the act. *See Wineberg v. Department of Labor & Indus.*, 57 Wn.2d 779, 359 P.2d 1046 (1961). During the 1971 First Extraordinary Session, the Washington Legislature enacted

---

[1]U.S. Const. amend. 14, § 1, provides in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2]Const. art. 1, § 12:
"Special privileges and immunities prohibited. No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

legislation which substantially amended the workers' compensation act. *See* Recent Developments, *Workmen's Compensation—Washington's Recent Amendments: Universal Mandatory Coverage, Liberalized Benefits, and a Controversial Two–Way Plan—Ch. 289, Washington Laws of 1971; Ch. 43, Washington Laws of 1972,* 47 Wash. L. Rev. 717 (1972). The original rationale for this exclusion was the widely held belief that farming was generally not a hazardous activity. Since workers' compensation in this state was originally limited to ultrahazardous occupations, coverage for agricultural work was viewed as unnecessary. *See Wineberg.*

Over the years, traditional agricultural employment changed. One commentator, after observing that modern trends in farming negated the reasons for the exclusion, concluded:

> The trends toward larger farms, specialization of crops, and the mechanization of agriculture place the modern farmworker in much the same situation as the industrial worker.

47 Wash. L. Rev. at 722.

Perhaps in response to these changes in agricultural work, the Legislature soon amended the statute to provide coverage. Thus, in 1971, amendments to the workers' compensation act extended coverage to virtually all workers. It contained, however, several exclusions, including the following:

> Any employee whose cash remuneration paid or payable by the employer in any calendar year for agricultural labor is less than one hundred fifty dollars: *PROVIDED, That the exemption contained in this subsection shall expire and have no force or effect on December 31, 1972.*

(Italics ours.) Laws of 1971, 1st Ex. Sess., ch. 289, § 3(6), p. 1544. Governor Evans vetoed this last sentence, thus making the exclusion permanent.

In 1972 the Legislature again amended the statute. At this time the concept of ultrahazardous activity was dropped and the $150 exclusion for agricultural workers

took its present form.

Appellants' argument begins with the premise, which the Department accepts, that having elected to provide coverage for agricultural workers, the Legislature must do so without discriminating on the basis of race and without infringing upon the workers' constitutional right to travel. Appellants contend that the statute must be subjected either to strict scrutiny, or at least to intermediate, substantial relationship scrutiny. Strict scrutiny is required, they urge, because the statute has a disparate impact on Mexican Americans and Mexican Nationals, and adversely affects such workers' right to travel. Appellants assert that the statute does not withstand either of these two heightened levels of scrutiny. The Department, on the other hand, contends that the statute need only be subjected to, and is valid under, the rational relationship test. Although there may be a disparate impact on a minority ethnic group, since there is no evidence of purposeful discrimination, strict scrutiny is not warranted. Furthermore, any adverse effect on the workers' right to travel is minimal and merely incidental to the primary purpose of the statute.

We hold that the statute is an unconstitutional infringement on appellants' right to travel, and reverse.

## II

At the outset of any equal protection analysis, it is necessary to identify the standard of review against which the challenged legislation is to be measured. *State v. Smith,* 93 Wn.2d 329, 335, 610 P.2d 869, *cert. denied,* 449 U.S. 873 (1980). In the past, this task was a relatively simple one, because the courts recognized only two classifications. In *Smith,* we described those tests as follows:

> Two tests are used to judicially measure classifications alleged to violate equal protection: the strict scrutiny test and the rational relation test. The former is applied whenever a legislative classification involves a fundamental right or creates a suspect classification.
>
> The latter, the rational relation test, despite contrary dicta appearing from time to time in our cases, is used

whenever legislation does not infringe upon fundamental rights or create a suspect classification.

(Footnote and citations omitted.) *Smith,* at 335–36.

Increasingly, however, commentators have suggested and even insisted that the traditional 2–tier analysis is inadequate to describe the opinions of the United States Supreme Court. *See, e.g.,* Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection,* 86 Harv. L. Rev. 1 (1977); Note, *Equal Protection: A Closer Look at Closer Scrutiny,* 76 Mich. L. Rev. 771 (1978); Blattner, *The Supreme Court's "Intermediate" Equal Protection Decisions: Five Imperfect Models of Constitutional Equality,* 8 Hastings Const. L.Q. 777 (1981); L. Tribe, *American Constitutional Law* (1978). Many of these commentators urge that the Court applies greater than rational scrutiny to certain areas of equal protection analysis. Two areas generally receive such heightened scrutiny: those involving quasi–suspect classifications (*e.g.,* gender, *Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971)) and those involving important, but not fundamental, interests (*e.g.,* possession of driver license, *Bell v. Burson,* 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971)). *See also* L. Tribe, at 1089–92. The constant flux in the development of this legal doctrine has made our court reluctant to follow the United States Supreme Court's lead in using heightened or mid–tier scrutiny. Thus, in *Smith,* we noted that "[w]e have never adopted and used a higher standard in the absence of a suspect class or fundamental right." *Smith,* at 336 n.2.

Subsequent to our decision in *Smith,* the United States Supreme Court decided *Plyler v. Doe,* 457 U.S. 202, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982). The *Plyler* opinion contains language that must resolve all doubt about the existence of a heightened scrutiny test. In striking down a Texas statute which authorized local school districts to deny enrollment to children of illegal aliens, the Court observed:

In applying the Equal Protection Clause to most forms of state action, we . . . seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

But . . . we have treated as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest. *In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State.*

(Footnotes omitted. Italics ours.) *Plyler,* at 216–18. *Cf. Martinez v. Bynum,* __ U.S. __, 75 L. Ed. 2d 879, 103 S. Ct. 1838 (1983).

Although *Plyler* clarifies the existence of a mid–tier equal protection test, it does not suggest the proper parameters of the doctrine. Thus, it provides no guidance as to how, or when, to apply heightened scrutiny. Because we find the present statute subject to strict scrutiny, we find it unnecessary to address the implications of *Plyler* on our equal protection analysis.

### III

Turning then to the strict scrutiny test, we note first that the appellants base their argument that the statute should be subject to strict scrutiny on two theories. The first argument consists largely of the allegation that the statute impermissibly discriminates on the basis of race. To support this argument, the appellants introduced evidence of the disparate impact that the statute has on Hispanics. Appellants then rely on *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977). They quote the following passage:

Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Arlington Heights,* at 266. Brief of Appellants, at 24.

█ Respondent, relying on *Washington v. Davis,* 426 U.S. 229, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1976), urges that statistics alone will not trigger strict scrutiny, unless there is some evidence of purposeful discrimination or intent. We agree with respondent. The evidence of disparate impact presented by appellants is not sufficient to trigger strict scrutiny. *Washington v. Davis, supra,* clearly states that disparate impact, standing alone, does *not* trigger strict scrutiny. *Washington,* at 242. Furthermore, appellants' reliance on *Arlington Heights* is misplaced. Immediately following the passage quoted by appellants, the Court observed:

But such cases are rare. Absent a pattern as stark as that in *Gomillion [v. Lightfoot,* 364 U.S. 339 (1960)] or *Yick Wo [v. Hopkins,* 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence.

(Footnotes omitted.) *Arlington Heights,* at 266. In *Yick Wo v. Hopkins,* 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886), the facially neutral classification provided that it was unlawful to operate a laundry without a permit in a wooden building. Yick Wo and 200 other Chinese laundrymen applied for and were denied a permit. All but one of the 80 non–Chinese who applied for such permits received them.

*Gomillion v. Lightfoot,* 364 U.S. 339, 5 L. Ed. 2d 110, 81 S. Ct. 125 (1960) involved the redistricting of the city limits of Tuskegee, Alabama. Prior to the redistricting, the city was square in shape. The redistricting transformed the city into a "strangely irregular twenty–eight–sided figure". *Gomillion,* at 341. The effect of this redefinition of boundaries was to remove all but four or five of the city's 400 black voters from the city's limits while not removing a

single white one.

The state action (statute) here simply does not have the same dramatic impact. At best, the appellants allege that 73 percent of the individuals affected are Hispanics. The challenged actions in *Yick Wo* and *Gomillion* approached 100 percent. Appellants' reliance on *Castaneda v. Partida,* 430 U.S. 482, 51 L. Ed. 2d 498, 97 S. Ct. 1272 (1977) is also misplaced. In *Castaneda,* the Court allowed statistics to prove a prima facie case of discrimination in the selection of grand jurors when they were combined with a selection procedure susceptible to abuse. No subjective procedure, susceptible to abuse, exists here.

Since the appellants present no evidence establishing purposeful discrimination, their first argument for strict scrutiny is rejected.

Appellants' evidence does establish, however, a substantial disparate impact upon a racial minority. Although as noted above, the Supreme Court has rejected strict scrutiny for disparate impact cases, its decision in *Plyler v. Doe, supra,* suggests an intermediate standard may be appropriate. Because we believe strict scrutiny is independently warranted by the effect this statute has upon appellants' fundamental right to travel, we do not resolve the issue of whether the statute would survive an intermediate scrutiny analysis.

Appellants' argument that the statute infringes upon their fundamental right to travel starts with the observation that the typical farm worker must move from farm to farm and state to state in order to obtain continual employment. Since the $150 exclusion penalizes them for exercising their "fundamental right to travel", they conclude it is invalid. Appellants cite *Eggert v. Seattle,* 81 Wn.2d 840, 505 P.2d 801 (1973), *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969) and *Memorial Hosp. v. Maricopa Cy.,* 415 U.S. 250, 39 L. Ed. 2d 306, 94 S. Ct. 1076 (1974) to support their allegation that the right to travel is a fundamental right subject to strict scrutiny.

Respondent, on the other hand, argues that the statute should be evaluated under the rational relationship test. To support this proposition, respondent cites *Romero v. Hodgson,* 319 F. Supp. 1201 (N.D. Cal. 1970), *aff'd mem.,* 403 U.S. 901, 29 L. Ed. 2d 678, 91 S. Ct. 2215 (1971) and *Doe v. Hodgson,* 344 F. Supp. 964 (S.D.N.Y. 1972), *aff'd with opinion,* 478 F.2d 537 (2d Cir.), *cert. denied,* 414 U.S. 1096, 38 L. Ed. 2d 555, 94 S. Ct. 732 (1973). Respondent's reliance on these cases is misplaced. In *Romero,* a 3–judge panel upheld state and federal statutes which excluded agricultural labor from the definition of "employment" for the purposes of unemployment compensation. The court applied only a rational relationship test because the plaintiffs had failed to establish a suspect classification or assert a fundamental right. In *Doe,* a similar challenge was denied because the court found *Romero* controlled. Although the plaintiffs in *Doe* generally alleged an interest in the right to travel, they did not establish the existence of a penalty on that right. For the reasons discussed below, we believe the present statute constitutes a penalty on appellants' fundamental right to travel.

 The Court has described the right to travel as a right which "occupies a position fundamental to the concept of our Federal Union." *Shapiro,* at 630 (quoting *United States v. Guest,* 383 U.S. 745, 757, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966)). The confines of that right have not been clearly defined, however. *Shapiro* involved a 1–year waiting requirement for welfare benefits. The Court held that such waiting periods were invalid because they operated to deter the migration of indigents. The Court indicated that the constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land, uninhibited by statutes, rules or regulations which unreasonably burden or restrict this movement. *Shapiro,* at 629.

Yet, this right is not absolute. The Court acknowledged the validity of certain restrictions in the following passage:

We imply no view of the validity of waiting–period *or* residence requirements determining eligibility to vote, eligibility for tuition–free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel.

*Shapiro,* at 638 n.21. The *Shapiro* analysis, however, suggests that the right to travel is very broad and the only restrictions on the concept involve a determination of whether the questioned provision involves a "penalty". Unfortunately, the only definition of penalty available in *Shapiro* is the broad statement that it is a denial of the basic necessities of life. *Shapiro v. Thompson, supra.*

The subsequent case of *Memorial Hosp. v. Maricopa Cy., supra,* seems to narrow the concept slightly. There, the Court implied that whatever the nature of the right, a certain "amount of impact" on the right to travel is required before the strict scrutiny/compelling state interest test will be triggered. Again, the Court declined to describe the requisite amount of impact. The Court noted only that

*Shapiro* and *Dunn* [*v. Blumstein,* 405 U.S. 330 (1972)] stand for the proposition that a classification which "operates to *penalize* those persons . . . who have exercised their constitutional right of interstate migration," must be justified by a compelling state interest. *Oregon v. Mitchell,* 400 U. S. 112, 238 (1970) (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.) . . . Although any durational residence requirement imposes a potential cost on migration, the Court in *Shapiro* cautioned that some "waiting–period[s] . . . may not be penalties." 394 U. S., at 638 n. 21. In *Dunn* v. *Blumstein, supra,* the Court found that the denial of the franchise, "a fundamental political right," *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964), was a penalty requiring application of the compelling–state–interest test. In *Shapiro,* the Court found denial of the basic "necessities of life" to be a penalty. Nonetheless, the Court has declined to strike down state statutes requiring one year of residence as a condition to lower tuition at state institutions of higher

education.

Whatever the ultimate parameters of the *Shapiro* penalty analysis, it is at least clear that medical care is as much "a basic necessity of life" to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements.

(Footnotes omitted.) *Memorial Hosp.*, at 258–59.

We believe the workers' compensation program in question is as basic a necessity to life as the health care at issue in *Memorial Hosp.* or the welfare payments denied in *Shapiro.* Here, the workers are engaged in an extremely dangerous occupation. The evidence before the trial court demonstrated that the mean family income for these workers prior to 1978 was $3,834 for seasonal workers and $3,573 for migrants. Ninety percent of this income was from farm work and almost three–fourths of the workers surveyed received no other source of income. Brief of Appellants, app. 2. Consequently, to these workers, the income from farm work is their only resource for funds to purchase food, shelter and medical care. Under these circumstances, we conclude that the statute in question constitutes a penalty on appellants' fundamental right to travel by denying them basic necessities of life.

Respondent argues that the exclusion is justified because of the administrative burden and costs which would be imposed upon employers if coverage were provided. Given the most recent data from the Department, it is doubtful whether the cited rationale would survive even a rational relationship test. For instance, in response to legislative inquiries concerning the impact of removing the exclusion from all agricultural workers except berry pickers, the Department replied:

Little additional paper work is seen falling on the employer by reason of filling out such reports for employments currently exempt. Of course, the employer would have to keep track of the time worked by each such employee, *which he is presumed to do anywise*

*since the exempt status of the worker becomes evident only on termination of employment.*

(Italics ours.) Fiscal Note, House Bill 257, 48th Legislature (1983), Brief of Amici Curiae, app. 1.

Even if we were to assume that the exclusion would result in some nominal administrative costs, such costs would not rise to the level of a compelling state interest, as is required to justify the present infringement upon appellants' fundamental rights.

Furthermore, our state constitution privileges and immunities clause, Const. art. 1, § 12, independently supports our conclusion that this provision denies appellants equal protection of the law.

We conclude the $150 exclusion is an impermissible infringement on appellants' fundamental right to travel, which denies them equal protection of the law. We therefore reverse.

WILLIAMS, C.J., and STAFFORD, UTTER, DORE, and PEARSON, JJ., concur.

DIMMICK, J., concurs in the result.