[No. 5892–1–III.  Division Three.  December 4, 1984.]

JOSE SANCHEZ, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *Robert G. Swenson, Assistant,* for appellant.

*Daniel Ford* and *Wm. M. Hamilton,* for respondent.

McInturff, J.—The Department of Labor and Industries seeks review of the summary judgment granted an injured worker's compensation claimant. We reverse.

On August 30, 1979, Jose Sanchez fell from a ladder dur-

ing the course of employment, and sustained a compression fracture of the 12th dorsal vertebra, and lower back injury. On July 27, 1981, the Department of Labor and Industries (DLI) closed Mr. Sanchez's claim for industrial injury with an unspecified permanent partial disability award of 15 percent, category 4, dorsolumbar and lumbosacral impairments. The Department further reduced the dollar amount of that award by 25 percent, pursuant to its construction of RCW 51.32.080(2). The claimant appealed to the Board of Industrial Insurance Appeals, and the Board conducted a hearing. While all the medical witnesses agreed Mr. Sanchez's permanent disability is rated a category 4 permanent dorsolumbar and lumbosacral impairment, there was testimony that the claimant's compression was "marked".[1]

The Industrial Appeals judge proposed affirming DLI's reduction of the award. On December 8, 1982, the Board adopted the proposed decision. Mr. Sanchez appealed to superior court where he prevailed on motion for summary judgment. The court concluded DLI erroneously reduced by 25 percent his category 4 permanent partial disability dollar amount. DLI appeals that determination.

DLI assigns error to the trial court's defining the word "marked" in terms of its ordinary meaning rather than as

[1]Dr. John Callahan did not testify at the hearing, but his written report of May 11, 1982, was accepted as evidence on behalf of the claimant. In concluding Mr. Sanchez belonged in category 4, the doctor states Mr. Sanchez's X–rays "show a *markedly* depressed anterior margin of the 12th dorso vertebra." (Italics ours.) He also reported, "[t]he *interspace height on both sides of this vertebra is markedly* narrowed." (Italics ours.)

In May 1982, Dr. Irvin Tobin, on behalf of DLI, testified Mr. Sanchez's X–rays revealed a "mild" compression within the meaning of category 4, of greater than 50 percent anteriorly and not represented by "marked objective findings" as that term is used in the WAC. He further opined on cross, "It's a *clear* compression in that you can see it easily. It is *marked* in that it is 50 percent that is *marked,* but it doesn't involve the entire vertebra body." (Italics ours.)

Dr. William Smith, Mr. Sanchez's treating doctor, testified for DLI the claimant had "mild objective findings" but no "*marked* objective clinical findings" within the meaning of category 4. (Italics ours.) He opined the compression was significant and "clear" but as for "*marked*", he could not "characterize it as the worst–third of severity." (Italics ours.)

the word is used in the Washington Administrative Code. As will be discussed, the definition of "marked" is determinative of whether DLI may reduce a disability award by 25 percent.

The parties agree that claimant's permanent disability is a category 4 permanent dorsolumbar and lumbosacral impairment. That category is defined as:

> Mild low back impairment, with mild continuous or moderate intermittent objective clinical findings of such impairment, with mild but significant x–ray findings and with mild but significant motor loss objectively demonstrated by atrophy and weakness of a specific muscle or muscle group.
>
> This and subsequent categories include the presence or absence of a surgical fusion with normally expected residuals.

WAC 296–20–280(4). The controversy arises due to operation of the 1979 amendments to RCW 51.32.080(2), which state in relevant part:

> That compensation for unspecified permanent partial disabilities involving injuries to the *back* that do not have *marked* objective clinical findings to substantiate the disability shall be determined at an amount equal to seventy–five percent of the monetary value of such disability as related to total bodily impairment . . .

(Italics ours.) Laws of 1979, ch. 104, § 1, p. 402. Since 1971, RCW 51.32.080 has also instructed that compensation for nonamputation disability, which is permanent and partial (called "unspecified" disability) must be in an amount proportionate to total bodily impairment. Laws of 1971, 1st Ex. Sess., ch. 289, § 10, p. 1551. The same year, DLI was directed, by proviso in the same statute:

> That in order to reduce litigation and establish more certainty and uniformity in the rating of unspecified permanent partial disabilities, the department shall enact rules having the force of law classifying such disabilities in the proportion which the department shall determine such disabilities reasonably bear to total bodily impairment. In enacting such rules, the department shall give consideration to, but need not necessarily adopt, any nationally

recognized medical standards or guides for determining various bodily impairments.

Laws of 1971, 1st Ex. Sess., ch. 289, § 10, p. 1551, codified at RCW 51.32.080(2).

In 1974, DLI promulgated a comprehensive set of rules to carry out this mandate. WAC 296–20–220(1)(a) provides:

> (1) Evaluations of permanent bodily impairment using categories require uniformity in procedure and terminology. The following rules have been enacted to produce this uniformity and shall apply to all evaluations of permanent impairment of an unspecified nature.
>
> (a) Gradations of relative severity shall be expressed by the words "minimal," "mild," "moderate" and "marked" in an ascending scale. "Minimal" shall describe deviations from normal responses which are not medically significant. "Mild," "moderate" and "marked" shall describe ranges of medically significant deviations from normal responses. "Mild" shall describe the least severe third. "Moderate" shall describe the middle third. *"Marked" shall describe the most severe third.*

(Italics ours.) *See also* WAC 296–20–270(1)(b) (requiring objective medical testing for lower back impairment).

Claimant's designation, category 4, refers to "mild" impairments. By comparison, categories 1 through 3 range from subjective complaints of back pains without substantiating objective clinical findings to increasingly severe "mild" impairments which nevertheless lack "significance". WAC 296–20–280(1)–(3). Category 4 is more severe but the term "marked" is not used in its definition. It is mid–range of the eight categories of permanent dorsolumbar and lumbosacral impairments. Categories 5 through 8, with ascending severity, require "marked" findings and/or "marked" impairment or "marked" motor loss. WAC 296–20–280(5)–(8).

For purposes of calculating benefits, RCW 51.32.080 provides the amount for total bodily impairment is $60,000 (and the total disability allowed for stacking permanent partial disabilities is also $60,000). However, there is a further proviso that stacking partial back injuries where there

are no "marked objective clinical findings" may not exceed the sum of $45,000. This proviso follows, but is separate from the one quoted earlier, central to this appeal, which allows 25 percent reduction from the value of the partial disability as it relates to total disability where there are no marked objective clinical findings (the 75 percent rule).

The Legislature is presumed to have full knowledge of existing law when enacting new legislation. *Renton Educ. Ass'n v. Public Empl. Relations Comm'n*, 101 Wn.2d 435, 442, 680 P.2d 40 (1984); *Thurston Cy. v. Gorton*, 85 Wn.2d 133, 138, 530 P.2d 309 (1975). Thus, in using the term "marked" in the 1979 amendments, it was aware of the 1974 WAC "marked" categories. Although a WAC is not a statute, the 1971 language in RCW 51.32.080(2) specifically directed promulgation of such WAC's to reduce litigation and to provide uniformity, and those rules were by statutory fiat to have the "force of law". These WAC's have been held to be valid and consistent with the enabling legislation. *Vliet v. Department of Labor & Indus.*, 30 Wn. App. 709, 712–13, 638 P.2d 112 (1981), *review denied*, 97 Wn.2d 1002 (1982). Similarly, the term "marked" should not be given its ordinary dictionary meaning because of the 1971 statutory directive that in enacting its rules, "the department shall give consideration to, but need not necessarily adopt, any nationally recognized medical standards or guides for determining various bodily impairments." RCW 51.32.080(2).

Since all doctors agree the claimant's disability was a category 4 impairment, and because the medical WAC term "marked" does not apply unless a claimant fits into the more severe categories 5 through 8, the 25 percent reduction must be applied. Any other conclusion would mean the 75 percent rule would probably never apply since most permanent partial disability ratings must be supported by medical evidence based on some objective findings. *See, e.g., Cayce v. Department of Labor & Indus.*, 2 Wn. App. 315, 316, 467 P.2d 879 (1970) (citing *Page v. Department of Labor & Indus.*, 52 Wn.2d 706, 328 P.2d 663 (1958));

*accord,* WAC 296–20–270(1)(b) ("[g]radations of clinical findings of low back impairments in terms of 'mild,' 'moderate,' or 'marked' shall be based on objective medical tests."). *But see Price v. Department of Labor & Indus.,* 101 Wn.2d 520, 521, 682 P.2d 307 (1984) (where psychological disability is at issue, the requirement of objective manifestation of symptoms is inappropriate).

Mr. Sanchez counters that if "marked" is not to be allowed its ordinary dictionary meaning, then the statutory $45,000 ceiling for stacking partial disabilities makes no sense since the WAC's do not allow for more than $21,000 where severity is less than "marked". That is, the highest dorsal impairment category, which does not require marked findings, is computed at 10 percent of $60,000, or $6,000, and the highest dorsolumbar and lumbosacral impairment is limited to 25 percent of $60,000, or $15,000 for a total of $21,000. *See* WAC 296–20–680(2) and (5). However, this arithmetic analysis ignores the possibility of cervical–cervicodorsal involvement, not requiring marked findings, which translates to 40 percent of $60,000, or $24,000, when coupled with dorsolumbar and lumbosacral impairments. *See* WAC 296–20–690(4). Nor does it take into consideration the possibility of neurological (or other impairment) overlap of 10 percent to 60 percent of $60,000. *See, e.g.,* WAC 296–20–680(5).[2] In such hypothetical cases, the $45,000 ceiling conceivably would have application. Regardless, the $45,000 cap is as superfluous under the claimant's theory as with DLI's, since under the most severe back impairment category, involving total loss of lower back function, the afflicted person would receive $45,000 and no more, without reduction.[3]

---

[2]The limitations of the definition of a "back" impairment for purposes of application of the $45,000 ceiling has not been made an issue in this appeal.

[3]Pursuant to RAP 10.8 which permits filing of additional authorities after oral argument prior to filing of this court's opinion, Mr. Sanchez now submits an unpublished decision and order of the Board of Industrial Insurance Appeals from an unrelated case, In re Steven W. Randall, claim H–968365 (April 27, 1984). DLI

Lastly, Mr. Sanchez maintains that if RCW 51.32.080(2) is to be construed as allowing an additional 25 percent reduction for nonsevere back impairments, while workers who have injuries in the lower two–thirds of severity affecting other parts of the body receive no reduction, then back claimants such as Mr. Sanchez are denied their right to equal protection under the fourteenth amendment to the United States Constitution and the Washington Constitution's privileges and immunities clause, article 1, section 12. We disagree.

---

objects to consideration of this submission because the asserted authority is unpublished and is a decision of a quasi–judicial agency. Without deciding whether such a determination may be a part of Washington's common law, we note that while agency decisions have been deemed precedential to the extent "[t]hey generally provide a guide to action . . the agency may be expected to take in future cases.", *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 765–66, 22 L. Ed. 2d 709, 89 S. Ct. 1426 (1969), and to the extent courts impose a "duty of consistency" upon agencies within the guidelines of permitted agency discretion, *Vergeyle v. Department of Empl. Sec.,* 28 Wn. App. 399, 404, 623 P.2d 736 (1981); *see also Renton Educ. Ass'n v. Public Empl. Relations Comm'n,* 101 Wn.2d 435, 680 P.2d 40 (1984) (agency determinations of statutory construction are entitled to "substantial weight"), here the questioned order not only represents a conflict between two types of agency bodies, but also is not published. *See State v. Fitzpatrick,* 5 Wn. App. 661, 668, 491 P.2d 262 (1971) (unpublished Court of Appeals decisions complicate legal research, create unfair advantages for some lawyers, do not become a part of the common law and therefore will not be considered as authority).

In its decision, the Board determined the automatic 75 percent computation by DLI based on the fact the claimant's disability did not reach category 5 or higher, was inappropriate because the WAC's describe *impairments* and not *findings.* Thus, the reasoning continues, while an impairment represents category 2, 3 or 4, such classification represents an overall judgment of the rating physician but may ignore a particular clinical finding which "even if not specifically so phrased . . . should be viewed by the knowledgeable claims adjudicator as 'marked' findings." Board decision, at 8.

Lastly, the Board notes that category 5 includes either "moderate continuous" or "*marked* intermittent" findings. While the foregoing analysis is thought provoking, it was accomplished without addressing the arguments made before this court. That is, it is the DLI which promulgated the WAC's. Under RCW 51.32-.080(2), DLI was given the authority to adopt medical standards when using the term "marked". Also, the Legislature was striving for consistency in a complicated area. The unpublished decision, if followed, makes application of the 75 percent rule more subjective, unpredictable, and needlessly complicated. Indeed, while the WAC categories describe "impairments", definitionally they also enumerate the specific "findings" necessary to rise to the particular impairment.

It is true that in granting rights to compensation, the Legislature can attach conditions to the privilege of receiving it. *Wheaton v. Department of Labor & Indus.,* 40 Wn.2d 56, 58, 240 P.2d 567 (1952). Nevertheless, when a state distributes benefits unequally to its citizens, the distinctions made are subject to scrutiny under the equal protection clause. *Zobel v. Williams,* 457 U.S. 55, 72 L. Ed. 2d 672, 102 S. Ct. 2309, 2312 (1982). Generally, a law will survive that scrutiny if a distinction "rationally furthers a legitimate state purpose [Rational Relation Test]." *Zobel,* 457 U.S. at 60; *see also Macias v. Department of Labor & Indus.,* 100 Wn.2d 263, 267–68, 668 P.2d 1278 (1983). Whenever a legislative classification involves "a fundamental right", such as free speech, or creates "a suspect classification", for example, race, the so–called strict scrutiny test is, instead, applied as the standard of review. A recent, but guarded, trend has been to apply a "mid–tier" or "heightened" judicial scrutiny to areas involving quasi–suspect classifications, *e.g.,* gender, and those concerning important interests which do not rise to the level of fundamental interest, such as possession of a driver's license. *Macias,* at 268 (citing *Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *Bell v. Burson,* 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971)). More recently, the Supreme Court applied heightened scrutiny to the Texas Legislature's classification denying public education to undocumented alien children. *Plyler v. Doe,* 457 U.S. 202, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982). In *Macias,* the Washington Supreme Court noted *Plyler* "provid[ed] no guidance as to how, or when, to apply heightened scrutiny." 100 Wn.2d at 269. Because the court found the challenged DLI statute subject to strict scrutiny since it infringed upon the fundamental right to travel, it was unnecessary to address the *Plyler* implications in its equal protection analysis. 100 Wn.2d at 271.

Here, Mr. Sanchez suggests the mid–tier or heightened scrutiny is appropriate so as to require DLI's showing a "substantial" state interest rather than mere proof of a

reasonable relationship to a legitimate state interest under the rational relationship test.

However, Mr. Sanchez has not made a case for departure from the traditional rational relationship test, for he has not suggested any reason for invocation of the doctrine except that the Supreme Court has recognized its existence in some limited contexts. Moreover, "classifications bearing on nonconstitutional interests—even those involving 'the most basic economic needs of impoverished human beings,'" usually will not be subject to heightened treatment "because they are not distinguishable in any relevant way from other regulations in 'the area of economics and social welfare.'" *Plyler,* 457 U.S. at 232 (Blackmun, J., concurring) (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970) (applying rational relationship test to state regulation imposing a limit upon the amount of aid to dependent children, which regulation adversely impacted large families)).[4]

Regarding the minimal scrutiny test, neither the federal equal protection clause, nor the state privileges and immunities clause, "requires perfection in legislative classification." *Washington State Sch. Directors Ass'n v. Department of Labor & Indus.,* 82 Wn.2d 367, 376, 510 P.2d 818 (1973) (quoting *State v. Persinger,* 62 Wn.2d 362, 368, 382 P.2d 497 (1963), *appeal dismissed, cert. denied,* 376 U.S. 187 (1964)). The Legislature has given wide discretion to designate classifications. The Washington courts have placed the burden upon the challenger to demonstrate a "particular classification is manifestly arbitrary, unreasonable, inequitable and unjust." *Washington State Sch. Directors Ass'n v. Department of Labor & Indus., supra* at 376. While Mr. Sanchez maintains that a 25 percent reduction for less severe back injuries when no other types of

---

[4]Strict scrutiny has been applied to welfare benefits statutes involving a 1–year waiting period. This was so, however, only because the restriction affected the fundamental right to travel. *Shapiro v. Thompson,* 394 U.S. 618, 630, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969).

disabilities are similarly discounted satisfies his burden of showing manifest arbitrariness, he has not tendered a factual basis for his proposition.

A 25 percent discount to a 15 percent disability is the same as allocating 11.25 percent in the first instance. As a constitutional proposition, the designation, without a factual showing, is not manifestly arbitrary. For example, the mid–category under pelvis impairments is rated at only 5 percent, which is much less than the 11.25 percent of the challenged dorsolumbar/lumbosacral impairments. WAC 296–20–680(4). Consequently, in this highly specialized area in which the Legislature appears to necessarily have delegated considerable authority (RCW 51.32.080), without a factual showing, a broad pronouncement of arbitrariness under a minimal scrutiny standard of review may not be made.

Having concluded the Superior Court erred in applying the ordinary meaning rule, it follows that DLI appropriately discounted Mr. Sanchez's award by 25 percent. It is therefore unnecessary to address whether a material issue of fact exists requiring a trial. We accordingly reverse. Since the claimant has not prevailed, he is not entitled to attorney fees under RCW 51.52.130, as requested in his brief.

MUNSON, C.J., and THOMPSON, J., concur.

Reconsideration denied March 1, 1985.

Review denied by Supreme Court May 24, 1985.