**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 5, 2020

~~Steve, C. J.~~
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 5, 2020

~~Susan L. Carlson~~
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOSE MARTINEZ-CUEVAS and PATRICIA AGUILAR, individually and on behalf of all others similarly situated, | ) ) ) ) | No. 96267-7 |
| Petitioners, | ) ) | |
| v. | ) ) | |
| DERUYTER BROTHERS DAIRY, INC., GENEVA S. DERUYTER, and JACOBUS N. DERUYTER, | ) ) ) ) | En Banc |
| Respondents, | ) ) | |
| and | ) ) | |
| WASHINGTON STATE DAIRY FEDERATION and WASHINGTON FARM BUREAU, | ) ) ) ) | |
| | ) | Filed: November 5, 2020 |
| Intervenor-Respondents. | ) ) | |

MADSEN, J.—This case concerns the constitutionality of RCW 49.46.130(2)(g), the provision exempting agricultural workers from the overtime pay requirement set out in the Washington Minimum Wage Act, ch. 49.46 RCW. At issue here is whether the

trial court properly granted partial summary judgment to an affected class of agricultural workers who argued that the exemption violates article I, section 12 of our state constitution and the equal protection clause. For the following reasons, we affirm as to article I, section 12.

## BACKGROUND

Jose Martinez-Cuevas and Patricia Aguilar worked for DeRuyter Brothers Dairy as milkers. DeRuyter milkers used mechanized equipment to milk close to 3,000 cows per shift, 24 hours a day, three shifts a day, 7 days a week.

In 2016, Martinez-Cuevas and Aguilar filed the present class action suit along with about 300 fellow DeRuyter dairy workers. The amended complaint claimed that DeRuyter failed to pay minimum wage to dairy workers, did not provide adequate rest and meal breaks, failed to compensate pre- and post-shift duties, and failed to pay overtime. The complaint also sought a judgment declaring RCW 49.46.130(2)(g)[1] unconstitutional.

The parties eventually reached a class settlement resolving all but the overtime pay claims. The trial court approved the settlement. The parties stipulated to class certification of the remaining claims. In February 2018, the trial court permitted the Washington State Dairy Federation and Washington Farm Bureau to intervene as defendants.

---

[1] RCW 49.46.130(1) requires employers to compensate employees for work in excess of 40 hours. Subsection (2)(g) exempts certain employees, such as individuals employed on farms, from receiving this compensation.

Martinez-Cuevas and Aguilar moved for summary judgment. They alleged that class members generally worked over 40 hours per week without receiving overtime pay and labored in dangerous conditions. The workers claimed that the agricultural industry was powerful while the agricultural workers were poor, and the exemption was racially motivated to impact the Latinx population, which constitutes nearly 100 percent of Washington dairy workers. Consequently, the workers argued, the agricultural exemption for overtime pay violates article I, section 12 of the Washington State Constitution because it grants a privilege or immunity to the agricultural industry pursuant to a law implicating a fundamental right of state citizenship—the right of all workers in dangerous industries to receive workplace health and safety protections.

The workers further argued that RCW 49.46.130(2)(g) violates the equal protection guaranty of the Washington Constitution. Because the Minimum Wage Act was based on the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219, which allegedly used race as the basis for exempting farmworkers from overtime compensation, the workers claim that the Minimum Wage Act incorporated the racist motivations underlying the federal statute. Clerk's Papers (CP) at 114, 105 & n.5 (citing *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 867-70, 281 P.3d 289 (2012) (recognizing the Minimum Wage Act definition of "employee" was based on the Fair Labor Standards Act)). These motivations are unrelated to protecting the health and safety of workers; because health and safety protections are a fundamental right under article II, section 35, the workers argue that strict scrutiny applies and that RCW 49.46.130(2)(g) fails this and any other level of scrutiny.

DeRuyter and the intervenors filed cross motions for summary judgment. They argued that RCW 49.46.130(2)(g) implicates no fundamental right and does not benefit one class over another or violate equal protection. DeRuyter and intervenors disputed the dairy workers' evidence regarding racial bias against Latinx, arguing the agricultural exemption could not be motivated by racial bias because when it was originally passed in 1959, most agricultural workers were white.

After oral argument, the trial court issued a letter order granting in part and denying in part the workers' motion for summary judgment. Eschewing the contention that article II, section 35 creates a fundamental right of state citizenship to employee protection laws, the court instead found in favor of the workers based on a different fundamental right—the right to work and earn a wage. The trial court noted that the right to work "treats a class of workers in a significantly different fashion than other wage earners engaged in the business of selling their labor." CP at 1213-14.

The court reserved for trial the question of whether the legislature had a reasonable ground for providing a privilege or immunity to the agricultural industry in the form of the overtime exemption and did not rule on the constitutionality of RCW 49.46.130(2). As a result, the court denied summary judgment for DeRuyter and the intervenors, denied motions to strike portions of the workers' briefing, and certified the summary judgment order for discretionary review. Martinez-Cuevas and Aguilar moved for discretionary review here, which we granted.

ANALYSIS

At issue is whether RCW 49.46.130(2)(g) violates the privileges or immunities clause or equal protection, article I, section 12 of the Washington State Constitution. We review the constitutionality of a statute de novo. *Schroeder v. Weighall*, 179 Wn.2d 566, 571, 316 P.3d 482 (2014). As with a court's construction of statutes, interpreting the meaning of constitutional provisions begins with the plain language of the text. *Malyon v. Pierce County*, 131 Wn.2d 779, 799, 935 P.2d 1272 (1997); *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004). Similarly, we review "a trial court's order on cross motions for summary judgment and related evidentiary rulings de novo." *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). An order granting summary judgment may be affirmed on any legal basis supported by the record. *Coppernoll v. Reed*, 155 Wn.2d 290, 296, 119 P.3d 318 (2005) (citing *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

Article I, section 12

"No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12. Passed during a period of distrust toward laws that served special interests, the purpose of article I, section 12 is to limit the sort of favoritism that ran rampant during the territorial period. *Ockletree v. Franciscan Health Sys.*, 179 Wn.2d 769, 775, 317 P.3d 1009 (2014) (plurality opinion) (citing ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 26-27 (G. Alan Tarr ed., 2002)).

Washington courts have at times interpreted article I, section 12 consistent with the federal equal protection clause, but we have also recognized that the text and aims of article I, section 12 are different. *Id.* at 775-76. Historically, this court has read the antifavoritism framework of article I, section 12 as limited to fundamental rights of state citizenship. *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902) (interpreting the state privileges and immunities clause consistent with article IV, section 2 of the federal constitution)). These fundamental rights, according to the dissent, were recognized in *Corfield v. Coryell* as Lockean "natural rights." 6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823) (No. 3,230). Dissent at 5; *but see* Richard L. Aynes, *Constricting the Law of Freedom: Justice Miller, The Fourteenth Amendment, and the* Slaughter-House Cases, 70 CHI.-KENT L. REV. 627, 651 (1994) (arguing that the "most logical reading of . . . *Corfield* is that 'fundamental' was not being used in a natural law sense, but rather as a synonym for 'constitutional'"). The dissent also asserts that *Corfield*'s natural rights interpretation evolved after the Civil War to favor an antidiscrimination construction, as evidenced by the *Slaughter-House Cases*,[2] among others. Dissent at 6 n.2. The *Slaughter-House* decision did adopt an antidiscrimination principle, but it did so at the expense of the language and purpose of the Fourteenth Amendment to the United States Constitution.

While the history of the federal privileges or immunities clause does not alter our holding in the present case, we take the opportunity to review it here in order to clarify

---

[2] 83 U.S. (16 Wall.) 36, 21 L. Ed. 394 (1873).

why we diverge from the federal antidiscrimination principle and, perhaps more importantly, to correct the many misstatements about the history of the Fourteenth Amendment.

Drafted in 1866 by Congressman John Bingham of Ohio, the Fourteenth Amendment was intended to give Congress the power to "secure to the citizen of each State all the privileges and immunities of citizens of the United States in the several States," and provide the power to "enforce the bill of rights as it stands in the Constitution today." CONG. GLOBE, 39th Cong., 1st Sess. 1095, 1088 (1866); *see also* Aynes, *supra*, at 629-32 (listing statements from Congressional lawmakers that the intent of the Fourteenth Amendment was to enforce the Bill of Rights against the states); Michael Anthony Lawrence, *Rescuing the Fourteenth Amendment Privileges or Immunities Clause: How "Attrition of Parliamentary Process" Begat Accidental Ambiguity; How Ambiguity Begat* Slaughter-House, 18 WM. & MARY BILL RTS. J. 445, 449-50 (stating that the members of Congress in 1866 understood "perfectly well that Section 1 [of the Fourteenth Amendment] was intended to repudiate *Barron* [*v. Baltimore*, 32 U.S. (7 Pet.) 243, 8 L. Ed. 672 (1833)]," which held that the Bill of Rights applies only to Congress).

Five years after ratification, the Supreme Court addressed the privileges or immunities clause for the first and, effectively, last time. *Slaughter-House* arose from a Louisiana law giving a private corporation the exclusive right to run a slaughterhouse in New Orleans but permitting all butchers to use it. 83 U.S. at 39. Butchers who were not part of the corporation challenged the action. *Id*. at 43. Writing for the majority, Justice

Samuel Miller rejected the challenge and upheld the statute. *Id.* at 60-61. Justice Miller then addressed the privileges or immunities clause in dicta, concluding that national rights were protected under the privileges or immunities clause of the Fourteenth Amendment, while state rights were covered by the privileges and immunities clause of article IV. *Id.* at 74-76. Justice Miller based this new distinction on citizenship largely on the different language in the Fourteenth Amendment and article IV. *Id.* at 75-76. Yet, as the dissenting justices pointed out, the majority misquoted article IV and made it appear to protect only state's rights. *Id.* at 75-76 (changing the phrase "citizens in the several states" to read "citizens of the several states"), 117 (Bradley, J., dissenting) (noting the misquotation). Justice Miller held that states already protected the rights claimed by the butchers in *Slaughter-House* and to hold them to be privileges or immunities would make the states subject to congressional control. *Id.* at 78.

Most scholars agree that *Slaughter-House* was wrongly decided. *E.g.*, Aynes, *supra*, at 627 (noting "'everyone' agrees the Court incorrectly interpreted the Privileges or Immunities Clause"). Tying national rights to the privileges or immunities clause prioritized a distinction that Congress did not intend. The decision ignores the plain language and purpose of the Fourteenth Amendment to substantially change the relationship between the states and federal government—specifically, to provide a means of enforcing the Bill of Rights against the states. *Slaughter-House*, 83 U.S. at 129 (Swayne, J., dissenting) (stating that the restrictions imposed on states by the privileges or immunities clause was "novel and large . . . [but] the novelty was known and the measure deliberately adopted"); Lawrence, *supra*, at 449; Aynes, *supra*, at 649-50.

Moreover, even though the *Slaughter-House* Court noted that the Reconstruction Amendments, including the Fourteenth, were intended to ensure freedom for emancipated slaves, the Court disavowed protection on the basis of race in favor of protection against discrimination based on state citizenship. *See Slaughter-House*, 83 U.S. at 71, 75-78. As history has shown us, states routinely failed to protect racial minorities and many enacted discriminatory Jim Crow laws. *E.g.*, *Civil Rights Cases*, 109 U.S. 3, 3 S. Ct. 18, 27 L. Ed. 835 (1883) (holding that the Thirteenth and Fourteenth Amendments did not permit Congress to outlaw racial discrimination at the hands of private individuals); Lawrence, *supra*, at 449 (stating that without the constraints of the privileges or immunities clause, states were free to "perpetuate unjust discriminatory Jim Crow laws.").

In this case, the dissent is correct that the federal antidiscrimination construction is no longer a helpful analogy in construing our state's article I, section 12. Dissent at 7. But this is not because of the evolution in *Corfield*'s "natural rights" doctrine as evidenced by the *Slaughter-House Cases*. Rather, we depart from the federal construction because it grew from an incorrectly decided *Slaughter-House* decision that radically changed the intent of the Fourteenth Amendment away from that of the provision's congressional authors. *See Wash. Water Jet Workers*, 151 Wn.2d at 477 (interpreting the ordinary meaning of a constitutional provision at the time of drafting also includes examining the provision's historical context).

Jurists and scholars have long recognized the true and unfortunate history of the privileges or immunities clause. *E.g.*, Aynes, *supra*, at 682-83 (noting the legal community initially viewed *Slaughter-House* as changing the meaning of the Fourteenth

9

Amendment away from the intent of the framers). Even scholars who agreed with the *Slaughter-House* majority acknowledged that it moderated the literal language of the Amendment. *Id.* at 684-85. Thus, scholars have overwhelmingly agreed that *Slaughter-House* was decided contrary to the intent of the Fourteenth Amendment. *Id*. at 685-86.

Where the Fourteenth Amendment to the United States Constitution was generally intended to prevent discrimination against disfavored individuals or groups, article I, section 12 was intended to prevent favoritism and special treatment for a few to the disadvantage of others. *Ockletree*, 179 Wn.2d at 776 (citing *State v. Smith*, 117 Wn.2d 263, 283, 814 P.2d 652 (1991) (Utter, J., concurring)). In *Grant County Fire Protection District No. 5 v. City of Moses Lake*, we recognized that article I, section 12 is more protective than the federal equal protection clause and in certain situations, requires an independent analysis. 150 Wn.2d 791, 805-12, 83 P.3d 419 (2004).

The independent analysis applies only where a law implicates a "privilege or immunity" as defined in our early cases distinguishing the fundamental rights of state citizenship. *Schroeder*, 179 Wn.2d at 572 (citing *Grant*, 150 Wn.2d at 812-13). In such situations, we have applied a two-step analysis. First, we ask whether a challenged law grants a "privilege" or "immunity" for purposes of our state constitution. *Id.* at 573 (citing *Grant*, 150 Wn.2d at 812). If the answer is yes, then we ask whether there is a "reasonable ground" for granting that privilege or immunity. *Id.* (citing *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 731, 42 P.3d 394 (2002), *vacated in part on reh'g*, 150 Wn.2d 791).

Benefits triggering this analysis are only those implicating fundamental rights of state citizenship. *Id*. (quoting *Vance*, 29 Wash. at 458). Generally, rights left to the discretion of the legislature have not been considered fundamental. *Grant*, 150 Wn.2d at 814.

1. RCW 49.46.130(2)(g) grants agricultural employers a privilege or immunity from providing overtime protections guaranteed to dairy workers under article II, section 35

The Washington Constitution protects employees working in certain especially dangerous industries. Article II, section 35 states:

> The legislature *shall* pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same.

(Emphasis added.) Martinez-Cuevas and Aguilar argue that article II, section 35 establishes the fundamental right to statutory protection for citizens working in extremely dangerous conditions. DeRuyter counters that the provision provides legislative discretion to set penalties for worker protection and, thus, creates no fundamental right. Yet article II, section 35 states that the legislature "shall" pass necessary laws, and the word "shall" is "presumptively imperative and operates to create a duty, rather than to confer discretion." *In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 601, 387 P.3d 1072 (2017) (citing *State v. Bartholomew*, 104 Wn.2d 844, 848, 710 P.2d 196 (1985)). No contrary intent appears in the provision, thus article II, section 35 *requires* the legislature to pass appropriate laws for the protection of workers. The discretion to fix penalties concerns the way in which a law is made to operate; it has no bearing on the requirement

11

to enact the law in the first instance.  *See Afoa v. Port of Seattle*, 176 Wn.2d 460, 470, 296 P.3d 800 (2013) (stating that article II, section 35 "requires the legislature" to enact laws protecting employees working in dangerous conditions).  Article II, section 35 mandates legislative action and constitutes a fundamental right of Washington workers to health and safety protection.

DeRuyter milkers constitute the type of workers protected by article II, section 35 because they worked long hours in conditions dangerous to life and deleterious to their health.  DeRuyter milking facilities were operated around-the-clock in order to service 3,000 cows.  DeRuyter's employment policy required milkers to stay until all cows were milked and to help clean the barn, unless excused early.  Martinez-Cuevas, Aguilar, and the class as a whole worked over 40 hours per week over 80 percent of the time they were employed by DeRuyter.

Moreover, dairy work is some of the most hazardous in the United States.  In 2015, the injury rate for Washington's dairy industry was 121 percent higher than all other state industries combined and 19 percent higher than the *entire* agricultural sector.  Milkers are exposed to physical strains, respiratory hazards, toxic chemicals, and risk of contracting diseases and injuries from animals; this exposure has led to cancer, respiratory disease, and neurological conditions.  Martinez-Cuevas and Aguilar both suffered injuries while working at DeRuyter's dairy farm.  Overtime work is particularly injurious, resulting in increased injuries, illness, and mortality.  CP at 314, 318 (overtime results in 61 percent higher injury hazard rate).  DeRuyter does not dispute that the dairy industry is dangerous to the health of dairy workers.  *See* CP at 750-55, 909 (only

material fact in dispute was allegedly racist history of agricultural exemption); Opening Br. of Resp'ts/Cross-Appellants at 7.

The extremely dangerous nature of dairy work entitles dairy workers to the statutory protection set out in article II, section 35. *See Macias v. Dep't of Labor & Indus.*, 100 Wn.2d 263, 274, 668 P.2d 1278 (1983) (noting that farmworkers engage in "an extremely dangerous occupation").

The legislature enacted this very protection in the form of the Minimum Wage Act. *See Anfinson*, 174 Wn.2d at 870 ("minimum wage laws have a remedial purpose of protecting against 'the evils and dangers resulting from wages too low . . . and from long hours of work injurious to health'" (internal quotation marks omitted) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 361, 65 S. Ct. 295, 89 L. Ed. 301 (1945))). Necessary to safeguard the health, safety, and general welfare of Washington citizens, the act establishes a minimum wage and provides overtime protections. RCW 49.46.005(1); LAWS OF 1959, ch. 294, § 3. The act's general rule requires an employer to pay its employees for time worked in excess of 40 hours per week, subject to certain exemptions. *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 301, 996 P.2d 582 (2000). Though farmworkers were eventually included in the minimum wage provision, LAWS OF 1989, ch. 1, § 1, they continued to be exempt from RCW 49.46.130's overtime compensation requirement. *See* RCW 49.46.130(2)(g).

Article II, section 35 creates the fundamental right of state citizenship to laws such as the Minimum Wage Act that protect the health and safety of dairy workers.[3] Our article I, section 12 case law bolsters this conclusion. We have expressly identified fundamental rights of state citizenship, but we have never characterized this list as comprehensive or limited to only those enumerated rights. *See Vance*, 29 Wash. at 458. *Vance* recognizes the fundamental right to "enforce other personal rights," *id.*, and the phrase "privileges and immunities" has been historically understood to encompass a broad range of rights such as "protection by the government." *Corfield*, 6 F. Cas. at 551, *quoted in Madison v. State*, 161 Wn.2d 85, 119, 163 P.3d 757 (2007) (J.M. Johnson, J., concurring). The right to statutory protection for health and safety pursuant to article II, section 35 contemplates the fundamental "personal rights" of *Vance* and "[p]rotection by the government" in *Corfield*.

The Minimum Wage Act excludes agricultural workers from the definition of employee and results in an exemption from the act's overtime requirement. RCW

---

[3] The dissent concludes that dairy workers have no fundamental rights in this case because the statutory protection for employees in dangerous conditions is a discretionary exercise of the legislature's police power. Dissent at 11, 14. This conclusion, however, ignores the critical fact that our state constitution expressly protects workers in such conditions under article II, section 35. Had the authors of our constitution omitted this provision, the legislature would still have the authority to enact worker protections under its police power. Thus, to agree with the dissent renders article II, section 35 meaningless. Under the provision, the legislature is required to enact statutory protections for workers in dangerous and deleterious conditions. Far from granting broad discretion, article II, section 35 imposes a duty. The legislature acted to meet this duty by passing the Minimum Wage Act. Once the legislature elected to offer overtime pay to all Washington workers, the exclusion of dairy workers from overtime pay is a violation of article I, section 12 unless reasonable grounds exist.

14

49.46.130(1), (2)(g). RCW 49.46.130(2)(g)'s exemption grants dairy farmers a privilege or immunity from paying otherwise mandatory overtime pay. RCW 49.46.130(1).

We may affirm the trial court on any grounds supported by the record. *Coppernoll*, 155 Wn.2d at 296. While the court below granted partial summary judgment to the workers based on the fundamental right to work and earn a wage, we conclude that article II, section 35 provides the dairy workers the fundamental right to health and safety protections of the Minimum Wage Act. We therefore agree with the trial court that RCW 49.46.130(2)(g) implicates a fundamental right and grants a privilege or immunity, satisfying the first prong of the privileges analysis. *See Schroeder*, 179 Wn.2d at 573.

2. The legislature lacked reasonable grounds for granting the overtime exemption to agricultural employers

The article I, section 12 reasonable ground test is more exacting than rational basis review. *Id*. at 574; *see also Ockletree*, 179 Wn.2d at 797 (Stephens, J., dissenting). Under the reasonable ground test, a court will not hypothesize facts to justify a legislative distinction. *Schroeder*, 179 Wn.2d at 574 (citing *City of Seattle v. Rogers*, 6 Wn.2d 31, 37-38, 106 P.2d 598 (1940)). Rather, the court will scrutinize the legislative distinction to determine whether it in fact serves the legislature's stated goal. *Id*. (citing *State ex rel. Bacich v. Huse*, 187 Wash. 75, 82, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979)). Speculation may suffice under rational basis review, but article I, section 12's reasonable ground analysis does not allow it. *Id*. at 575. If we are to uphold RCW 49.46.130(2)(g)'s overtime exemption, the provision must be justified in fact and theory. *See id.*

As noted, the trial court reserved the question of "reasonable basis" for granting the privilege or immunity for trial. CP at 1214. The court indicated that the issue is "simply not amen[]able to decision in the context of a CR 56 [summary judgment] motion." *Id.* The court also noted that "[t]he level of scrutiny must be determined by reference to issues of legislative intent and legislative history." *Id*. Such questions are questions of law, which courts review de novo. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (courts will look to the legislative history behind ambiguous statutes in order to ascertain and carry out legislative intent); *see also Schroeder*, 179 Wn.2d at 574 (stating that when conducting the reasonable ground analysis, courts will scrutinize the legislative distinction to determine whether it serves the legislature's stated goal). Moreover, the judiciary has the ultimate power and the duty to interpret, construe, and give meaning to words, sections, and articles of the constitution. *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 503, 585 P.2d 71 (1978). We therefore reach the second step of the privileges or immunities analysis. *See Schroeder*, 179 Wn.2d at 572-73.

DeRuyter asserts that lawmakers found the seasonal nature of farming and changes in weather, crop growth, commodity market prices, and husbandry rendered agricultural work ill suited to the 40-hour workweek and overtime pay under the Minimum Wage Act. Opening Br. of Resp'ts/Cross-Appellants at 24-25. The record, however, does not support these assertions.

First, while milking may slow in summer months, it occurs year-round. Br. of Amici Curiae Nat'l Emp't Law Project et al., at 14 n.28. Indeed DeRuyter dairy workers

16

milk thousands of cows per shift, 24 hours a day, 7 days a week.  CP at 845, 849 (audit noting that DeRuyter employed only two seasonal workers).  This constant, factory-like work is unlike that of piece-rate seasonal workers.  *See, e.g.*, *Lopez Demetrio v. Sakuma Bros. Farms*, 183 Wn.2d 649, 653, 355 P.3d 258 (2015) (describing seasonal workers harvesting fruit crops each year).  Further, other industries employing seasonal workers, such as retail, are not exempt from the overtime protections.  *See* Br. of Amici Curiae Nat'l Emp't Law Project et al., at 14 n.29.  Next, the legislative history offered by DeRuyter does not reference seasonality or the variations of agricultural work as considered during the passage of the Minimum Wage Act.  The history instead references unemployment insurance for agricultural workers, the consequences of increased operating costs, and legislative changes to the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW.  Opening Br. of Resp'ts/Cross-Appellants at 9, 24.  DeRuyter provides no link between WISHA and the Minimum Wage Act exemption.  The history of unrelated issues and statutes offers little in the way of legislative intent.

DeRuyter does not offer, and we have not found, any convincing legislative history that illustrates a reasonable ground for granting the challenged overtime pay exemption.  The stated purpose of the Minimum Wage Act is to protect the health and safety of Washington workers, as required by article II, section 35.  *See* RCW 49.46.005(1).  This purpose underlies the entirety of the act, including the overtime pay protections and exemptions.  In the face of this clear purpose and constitutionally mandated protection, the exemption in RCW 49.46.130(2)(g) is an impermissible grant of a privilege or immunity under article I, section 12 of Washington's constitution.

The trial court found that Martinez-Cuevas and Aguilar met the first step of the privileges and immunities analysis based on a facial challenge to RCW 49.46.130(2)(g). We affirm the court's ruling on this issue, based not on the fundamental right to work as the trial court found, but on the health and safety protections enshrined in article II, section 35. We are affirming the trial court's order and because an order granting summary judgment may be affirmed on any legal basis supported by the record, *Coppernoll*, 155 Wn.2d at 296, we hold that RCW 49.46.130(2)(g) violates article I, section 12 as applied to dairy workers, which is clearly supported by the arguments presented and the factual record before us.[4]

3. Martinez-Cuevas and Aguilar are entitled to attorney fees

Martinez-Cuevas and Aguilar seek attorney fees under RCW 49.48.030 and RAP 18.1(a). RCW 49.48.030 allows the award of fees where a person is "successful in recovering judgment for wages or salary owed." It is a remedial statute and must be construed liberally in favor of the employee. *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 34, 42 P.3 1265 (2002).

---

[4] Because we resolve the constitutionality of RCW 49.46.130(2)(g) under article I, section 12, we decline to address the workers' other constitutional claim of equal protection. *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000) (stating that if resolution of an issue effectively disposes of a case, a court is not required to reach additional issues presented). Additionally, retroactivity is not properly before this court. *See* concurrence at 10 n.1; *see also* dissent (Johnson, J.) at 1 (arguing for a prospective-only application of the majority's holding). Neither party raised this issue in its statement of grounds for review, consequently we did not grant review of it. *See* RAP 2.4(c). Nor is it necessary to resolve the case. RAP 12.1(b); *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988) (stating that an appellate court has inherent authority to consider an issue not raised by either party if necessary to resolve the case). We therefore decline to address it.

The only issue remaining before the trial court here was that of overtime pay. The trial court concluded that RCW 49.46.130(2)(g) granted a privilege or immunity and reserved the other aspects of the workers' claims for trial. While the trial court did not address the reasonable ground for granting the privilege or immunity, we have addressed it above and conclude that no reasonable ground exists. Therefore, we hold the exemption violates article I, section 12. It appears no further issues remain for the trial court to resolve, and therefore we remand the case to the trial court for entry of summary judgment in favor of Martinez-Cuevas, Aguilar, and their fellow class members. We also award their request for attorney fees.

CONCLUSION

RCW 49.46.130(2)(g) violates article I, section 12 of the Washington State Constitution as applied to dairy workers. We affirm and remand to the trial court for further proceedings consistent with this opinion.

_____
Madsen, J.

WE CONCUR:

_____
González, J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Wiggins, J.P.T.

No. 96267-7

GONZÁLEZ, J. (concurring)— Farmworkers across our state and our nation labor for subpoverty wages under dangerous working conditions to supply food for our tables. But since the 1930s, they have been excluded from many labor protections guaranteed to virtually all workers in other industries. Today, farmworkers continue to be excluded from the overtime protection of Washington's Minimum Wage Act (MWA). RCW 49.46.130(2)(g). This exclusion is unconstitutional on its face because it violates our state constitution's promise of equality under the law. *See* WASH. CONST. art. I, § 12. The exemption denies an important right to a vulnerable class, and defendants have not demonstrated it serves important governmental objectives. The plaintiffs are entitled to summary judgment.

ANALYSIS

Our state constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or

corporations." WASH. CONST. art. I, § 12. This provision prohibits both special interest favoritism and discrimination. *Schroeder v. Weighall*, 179 Wn.2d 566, 577, 316 P.3d 482 (2014). Like the federal equal protection clause of the Fourteenth Amendment, article I, section 12 guarantees equal protection under the law, meaning all persons similarly situated will be treated alike absent a sufficient reason to justify disparate treatment. *Id.*; *State v. Phelan*, 100 Wn.2d 508, 512, 671 P.2d 1212 (1983).

If a law disadvantages a suspect class or infringes on a fundamental right, we apply strict scrutiny and require the State to demonstrate its classification has been narrowly tailored to serve a compelling governmental interest. *Darrin v. Gould*, 85 Wn.2d 859, 865, 540 P.2d 882 (1975) (noting race, alienage, and national origin are examples of suspect classifications); *Macias v. Dep't of Labor & Indus.*, 100 Wn.2d 263, 271, 668 P.2d 1278 (1983) (applying strict scrutiny to a provision of workers' compensation law that burdened seasonal farmworkers' fundamental right to travel).

We also apply a form of heightened scrutiny to laws that single out politically powerless and marginalized groups for differential treatment with respect to important rights. Under this intermediate scrutiny standard, we uphold the classification only if it furthers an important governmental objective. *Phelan*, 100 Wn.2d at 512-14 (applying intermediate scrutiny to a law that works a

deprivation of liberty for incarcerated people who are poor); *Schroeder*, 179 Wn.2d at 578-79 (noting intermediate scrutiny is warranted for a law that burdens vulnerable children's access to the courts); *see Plyler v. Doe*, 457 U.S. 202, 223-30, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) (applying heightened scrutiny to a law denying undocumented immigrant children a basic public education).  Because such groups do not enjoy equal access to the legislative process, the judiciary must be especially vigilant to make sure laws that treat them differently are justified. *See Schroeder*, 179 Wn.2d at 578-79 (noting children in the foster care system and those whose parents are themselves minors are less socially integrated and less likely to be represented in the democratic process).

The statutory exclusion of farmworkers from overtime pay deserves at least intermediate scrutiny.  Farmworkers labor in arduous and dangerous conditions. Farmworkers are exposed to pesticides, use hazardous machinery, and work long hours in extreme heat and cold.  Eric Hansen, MD, and Martin Donohoe, MD, *Health Issues of Migrant and Seasonal Farmworkers*, 14 J. HEALTH CARE FOR POOR & UNDERSERVED, 153, 155-57 (2003).  Farmworkers are at risk of heat-related illness, bacterial and parasitic infections, toxic chemical injuries, certain types of cancer, and chronic musculoskeletal problems.  *Id.* at 157-59.  Yet, since the 1930s, lawmakers have systematically excluded them from health and safety

protections, including overtime pay, afforded to workers in other dangerous industries.

When federal lawmakers passed major labor reforms during the New Deal, they excluded farmworkers across the board. *See* Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, 72 OHIO ST. L.J. 95, 104 (2011). Farmworkers were excluded from the organizing and collective bargaining rights secured in the National Labor Relations Act of 1935 (NLRA), 29 U.S.C. §§ 151-169; from the minimum wage protections in the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 203; and from old-age benefits and unemployment insurance in the Social Security Act of 1935, 42 U.S.C. ch.7. *Id.* at 109-124. Racism directly influenced these exclusionary policies. *Id.* at 104. Plantation agriculture, which dominated the southern economy, depended on the exploitation of a black labor force. *Id.*; CP at 934-39 (MARC LINDER, MIGRANT WORKERS AND MINIMUM WAGES: REGULATING THE EXPLOITATION OF AGRICULTURAL LABOR IN THE UNITED STATES 8-13 (1992)). To obtain the support of Southern Democrats, proponents of President Roosevelt's New Deal agenda made compromises to preserve a quasi-captive, nonwhite labor force and perpetuate the racial hierarchy in the South by excluding agricultural workers. Perea, *supra*, at 98-99; CP at 939.

Farmworkers were also excluded when lawmakers enacted additional worker protections in the early 1970s. In 1971, Congress created the Occupational Safety and Health Administration (OSHA) to set and enforce workplace safety and health standards. Despite pesticides amounting to a major occupational hazard for farmworkers, Congress did not give OSHA the authority to regulate farmworker pesticide exposure. *See* Alexis Guild and Iris Figueroa, *The Neighbors Who Feed Us: Farmworkers and Government Policy—Challenges and Solutions*, 13 HARV. L. & POL'Y REV. 157, 178 (2018). Instead, Congress gave exclusive regulatory power to the United States Environmental Protection Agency (EPA), which, unlike OSHA, must conduct a cost-benefit analysis—taking into account interests other than worker safety—before passing workplace pesticide standards. *Id.*; Keith Cunningham-Parmeter, *A Poisoned Field: Farmworkers, Pesticide Exposure, and Tort Recovery in an Era of Regulatory Failure*, 28 N.Y.U. REV. L. & SOC. CHANGE 431, 448-52 (2004).

When adopting and adapting parallel state programs to protect workers, many state lawmakers continued to exclude farmworkers from minimum wage, overtime, and workers' compensation laws. When the Washington legislature enacted the MWA in 1959, it looked to the FLSA and imported wholesale the exclusion of farmworkers from minimum wage and overtime protections. LAWS OF 1959, ch. 294, § 3. It was not until 1989, and only through the initiative

process, that farmworkers gained coverage under the MWA's minimum wage provision. LAWS OF 1989, ch. 1, § 1. Washington's workers' compensation law also excluded all farmworkers when it was originally enacted, and then it failed to cover farmworkers on equal terms with other workers until this court held that an exclusion for some seasonal farmworkers was unconstitutional. *Macias*, 100 Wn.2d at 264.

Disparate treatment of farmworkers under labor laws endures. Farmworkers still rely on the EPA, rather than OSHA, for pesticide safety standards. Farmworkers remain excluded from the NLRA's protections for organizing and bargaining, and only about two percent of farmworkers belong to unions. *See* Press Release, U.S. Dep't of Labor, Bureau of Labor Statistics News Release: Union Members—2019 (Jan. 22, 2020), https://www.bls.gov/news.release/pdf/union2.pdf [https//perma.cc./X7GP-3GES]. While the FLSA's minimum wage requirements now apply to most agricultural workers, farmworkers are still excluded from the right to overtime pay, workers on small farms are not entitled to receive minimum wage, and children as young as 12 are legally allowed to work in fields.

Poverty, fear of deportation, and barriers to health care and education persist in farmworker communities. *See* CP at 442-68 (WASHINGTON STATE FARMWORKER HOUSING TRUST, A SUSTAINABLE BOUNTY: INVESTING IN OUR

AGRICULTURAL FUTURE, THE WASHINGTON STATE FARMWORKER SURVEY (2008));

CP at 569-580 (U.S. DEP'T OF LABOR, FINDINGS FROM THE NATIONAL

AGRICULTURAL WORKERS SURVEY: A DEMOGRAPHIC AND EMPLOYMENT PROFILE

OF UNITED STATES FARMWORKERS 2013-2014 (2016)). Farmworkers remain

among the poorest workers in the nation and often live in substandard housing

conditions. CP at 451 (describing rodent infestations, lack of heat, poor water

quality, and electrical problems), 450, 579; Hansen, *supra*, at 155. Almost three-

quarters of farmworkers in the country are immigrants, the overwhelming majority

from Mexico. CP at 577. Almost three-quarters of farmworkers are most

comfortable speaking in Spanish, and 43 percent speak little or no English at all.

*Id.* at 578. In Washington, 99 percent of farmworkers are Latino, and more than

three-quarters of farmworkers do not read or write in English. *Id.* at 459-60. Very

few farmworkers have health insurance or adequate access to medical care. *See id.*

at 453, 579; Hansen, *supra*, at 160 (citing lack of transportation, insurance, and

sick leave; language barriers; limited clinic hours; and illiteracy as barriers to

medical care). The average farmworker has completed an eighth-grade education.

*See* CP at 578. Farmworkers experience shorter life expectancy, experience higher

incidences of disease and disability, and experience high rates of sexual

harassment. Hansen, *supra*, at 156-59; CP at 199. Farmworkers remain some of

the most impoverished and socially excluded members of our society. It is no coincidence the law continues to disfavor them.

Subjugated to second-class worker status, farmworkers are precisely the type of politically powerless minority whose interests are a central concern of equal protection. *See Mathews v. Lucas*, 427 U.S. 495, 505-06, 96 S. Ct. 2755, 49 L. Ed. 2d 651 (1976) (recognizing illegitimate children as semisuspect class because the law has long placed them in an inferior position relative to legitimate children); *Plyler*, 457 U.S. at 218-23 (recognizing immigrant children as a vulnerable group because they are an underclass denied benefits that our society makes available to others); *Schroeder*, 179 Wn.2d at 578-79 (finding disadvantaged children, who are less socially integrated and less likely to be represented in the democratic process, are a vulnerable class).

The exclusion of farmworkers from overtime pay deprives them of an important health and safety protection that is afforded to other workers. The framers of our state constitution directed the legislature to enact health and safety protections for workers in dangerous industries. *See* WASH. CONST. art. II, § 35. The legislature did so when it enacted minimum wage and overtime requirements to protect workers from the harmful effects of low wages and long hours. *Parrish v. W. Coast Hotel Co.*, 185 Wash. 581, 587-89, 55 P.2d 1083 (1936), *aff'd*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937); *Anfinson v. FedEx Ground Package*

*Sys., Inc.*, 174 Wn.2d 851, 870, 281 P.3d 289 (2012). Farmworkers are no less in need of this protection than workers in other industries.

The exclusion of farmworkers can be justified only if it furthers an important governmental interest. *Phelan*, 100 Wn.2d at 512. DeRuyter argues the exemption, by sparing agricultural employers from the costs of overtime, furthers the government's interest in supporting the agricultural industry. *See* Opening Br. of Resp'ts/Cross-Appellants at 10 (citing the widespread belief that farming is a vital occupation that merits government aid), 11-12 (citing the agrarian myth and twin ideals that farming is good for the farmer and vital for the nation), 25 (noting agriculture's importance to the state); Intervenor Resp'ts and Cross-Pet'rs' Opening Br. at 31 n.16 (same). But the desire to spare employers in one industry from costs cannot, by itself, justify excluding some workers from the health and safety protections afforded to others. If it could, workers' equal protection rights would be subject to unrestricted legislative license, and equal protection would be an empty promise. *See Higgs v. W. Landscaping & Sprinkler Sys., Inc.*, 804 P.2d 161, 166 (Colo. 1991).

DeRuyter's appeal to the general welfare also does not save the law. DeRuyter contends the prosperity of the agricultural industry is vital to the welfare of Washingtonians. *See, e.g.*, Opening Br. of Resp'ts/Cross-Appellant at 25. But the promise of equal protection does not tolerate laws that aim to advance the

general welfare at the expense of a permanent underclass. For this reason, the United States Supreme Court in *Plyler* struck down a Texas law excluding undocumented immigrant children from the free public education system. *Plyler*, 457 U.S. at 205, 230. The Court found the State's interest in preserving resources for the education and welfare of other children could not justify perpetuating an underclass of state residents denied the ability to advance and participate in society. *Id.* at 218-24, 227. Excluding farmworkers from health and safety protections cannot be justified by an assertion that the agricultural industry, and society's general welfare, depends on a caste system that is repugnant to our nation's best self.

CONCLUSION

Today we face a global pandemic, and while many others stay home, farmworkers continue to go to work because they are recognized as essential. But they go to work on unequal terms. They deserve better. In my view, plaintiffs are entitled to summary judgment and to reasonable attorney fees in an amount to be determined by the clerk of this court, pursuant to RCW 49.48.030 and RAP 18.1. *See Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 306-07, 996 P.2d 582 (2000).[1]

---

[1] I agree with the majority that DeRuyter's request for prospective-only application is not properly before us. If it were, I would decline DeRuyter's request to apply any adverse decision only prospectively to future litigants. *See* Opening Br. of Resp'ts/Cross-Appellants at 44-49. The

_____
González, J.

_____
Gordon McCloud, J.

_____
Yu, J.

---

general rule is that a new decision applies retroactively to both the litigants before the court and in subsequent cases. *Taskett v. King Broad. Co.*, 86 Wn.2d 439, 448-49, 546 P.2d 81 (1976). We may use our equitable discretion to apply our decision only prospectively in exceptional cases where we are overruling a law that was justifiably relied on and retroactive application would be substantially unfair. *Id.*; *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 272, 208 P.3d 1092 (2009). In balancing the equities, we consider both the reliance interests *and* the considerations that compel our ruling. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 543-44, 111 S. Ct. 2439, 115 L. Ed. 2d 481 (1991). We apply the *Chevron Oil* test, which asks whether "(1) the decision established a new rule of law that either overruled clear precedent upon which the parties relied or was not clearly foreshadowed, (2) retroactive application would tend to impede the policy objectives of the new rule, and (3) retroactive application would produce a substantially inequitable result." *Lunsford*, 166 Wn.2d at 272 (footnote omitted) (citing *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106-07, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971)). The *Chevron Oil* test contemplates prospective only application in the rare case where retroactive application would not only impose great costs (factor 3) but would also have little benefit (factor 2). This is not an exceptional case that satisfies the test. Under the second factor, retroactive application of the decision will *further*, rather than impede, the policy objective of the decision. Farmworkers deprived of overtime pay have been denied equal protection of the law, and retroactive application would give them a remedy for this constitutional wrong. While I recognize DeRuyter relied on a statute that had not yet been challenged, its reliance interest is outweighed by the overriding equities that favor retroactivity.

11

*Martinez-Cuevas, et al. v. DeRuyter Brothers Dairy, Inc., et al.*
(Stephens, C.J., dissenting)

No. 96267-7

STEPHENS, C.J. (dissenting)—This case concerns a statutory benefit granted only at the discretion of the legislature: overtime pay. A class of affected agricultural workers argue that the provision of Washington's Minimum Wage Act (MWA), ch. 49.46 RCW, exempting them from overtime pay violates article I, section 12 of the Washington Constitution on both legislative favoritism grounds and equal protection grounds. The majority declares the exemption unconstitutional, despite the fact that entitlement to overtime pay is not a fundamental right implicating our state privileges and immunities clause. Nor does the legislative policy decision to exempt agricultural workers, among other worker groups, from overtime protections

evidence discrimination in violation of the equal protection clause. For the reasons explained below, I respectfully dissent.

## ANALYSIS

The workers present both facial and as-applied challenges to RCW 49.46.130(2)(g), which exempts agricultural employees from RCW 49.46.130(1)'s general overtime pay requirement. The workers argue the agricultural exemption violates article I, section 12 on both legislative favoritism grounds and equal protection grounds.

### I. STANDARD OF REVIEW

We review a statute's constitutionality de novo. *Schroeder v. Weighall*, 179 Wn.2d 566, 571, 316 P.3d 482 (2014). We likewise review a superior court's order on cross motions for summary judgment de novo. *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Because the superior court granted summary judgment in the workers' favor, we view all facts and draw all reasonable inferences in the light most favorable to DeRuyter. *See Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 295, 996 P.2d 582 (2000).

## II. LEGISLATIVE FAVORITISM

Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

The privileges and immunities clause requires an independent analysis from the federal equal protection clause in cases involving legislative favoritism. *Schroeder*, 179 Wn.2d at 572 (citing *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 805, 811, 83 P.3d 419 (2004)). But this antifavoritism analytical framework "did not overrule our long line of article I, section 12 cases addressing laws that burden vulnerable groups" on state equal protection grounds. *Schroeder*, 179 Wn.2d at 577. We thus address each of these challenges independently of one another. *Id.*

Under the antifavoritism framework, the terms "privileges" and "immunities" "pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship." *State v. Vance*, 29 Wash. 435, 458, 70 P. 34 (1902). This constitutional limitation recognizes the legislature "may[ freely exercise its police power] to promote the public welfare and safety and to safeguard life, health, property and morals, regulate businesses, professions and callings." *Ketcham v. King County Med. Serv. Corp.*, 81 Wn.2d 565, 569, 502 P.2d 1197 (1972) (plurality

opinion). "The police power of the State is an attribute of sovereignty, an essential element of the power to govern, and this power exists without declaration, the only limitation upon it being that it must reasonably tend to promote some interest of the State, and not violate any constitutional mandate." *CLEAN v. State*, 130 Wn.2d 782, 805, 928 P.2d 1054 (1996). Thus, while the State's police power is broad, "[l]egislatures may not under the guise of the police power" encroach on personal or private, common-law rights and privileges guaranteed by the state or federal constitutions unless the legislature has some reasonable basis for doing so. *See Ketcham*, 81 Wn.2d at 576 (discussing the freedom of contract). But it may draw statutory distinctions that do not implicate fundamental rights of state citizenship. *See Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 606-08, 192 P.3d 306 (2008) (determining smoking inside a place of employment is not a fundamental right of state citizenship, and the legislature may thus enact regulatory laws that in effect benefit certain businesses over others).

In *Vance*, we noted that "[t]hese terms, [privileges and immunities,] *as they are used in the* [C]*onstitution of the United States*, secure in each state to the citizens of all states the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights;

and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from." 29 Wash. at 458 (emphasis added) (citing THOMAS M. COOLEY & ALEXIS C. ANGELL, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 597 (6th ed. 1890)). The *Vance* court determined, "By analogy these words as used in the state constitution should receive a like definition and interpretation as that applied to them when interpreting the federal constitution." *Id.*

The classic case describing fundamental rights of citizenship under article IV, section 2, clause 1 of the United States Constitution—indeed, the principal case relied on in the Cooley treatise cited by *Vance*—is *Corfield v. Coryell,* 6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823) (No. 3,230) (expressing an expansive, "natural" rights interpretation of the federal privileges and immunities clause).[1] But after the Civil

---

[1] "At one time it was thought that this section recognized a group of rights which, according to the jurisprudence of the day, were classed as 'natural rights'; and that the purpose of the section was to create rights of citizens of the United States by guaranteeing the citizens of every State the recognition of this group of rights by every other State." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511, 59 S. Ct. 954, 962, 83 L. Ed. 1423 (1939); *see also* Martin H. Redish & Brandon Johnson, *The Underused and Overused Privileges and Immunities Clause*, 99 B.U. L. REV. 1535, 1556 & n.100 (2019) (quoting 1 LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1252 (3d ed. 2000) ("*Corfield* can best be understood as an attempt to import the natural rights doctrine into the Constitution by way of the Privileges and Immunities Clause of Article IV. By attaching the fundamental rights of state citizenship to the Privileges and Immunities Clause, Justice Washington would have created federal judicial protection against state encroachment upon the 'natural rights' of citizens.")). *Contra* majority at 6 (quoting Richard L. Aynes, *Constricting the Law of Freedom: Justice Miller, The Fourteenth*

War the United States Supreme Court began to curb *Corfield*'s "natural" rights interpretation, instead favoring an antidiscrimination construction:

> It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.

*Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L. Ed. 357 (1868) (addressing article IV, section 2, clause 1).[2]

---

*Amendment, and the* Slaughter-House Cases, 70 CHI.-KENT L. REV. 627, 651 (1994) (arguing that the "most logical reading of . . . *Corfield* is that 'fundamental' was not being used in a natural law sense, but rather as a synonym for 'constitutional.'")).

[2] For further examples of the evolution of United States Supreme Court privileges and immunities doctrine post-*Paul*, see, for example, *Ward v. State*, 79 U.S. (12 Wall.) 418, 20 L. Ed. 449 (1870); *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L. Ed. 394 (1873); *City of Detroit v. Osborne*, 135 U.S. 492, 10 S. Ct. 1012, 34 L. Ed. 260 (1890); *Crowley v. Christensen*, 137 U.S. 86, 11 S. Ct. 13, 34 L. Ed. 620 (1890); *McKane v. Durston*, 153 U.S. 684, 14 S. Ct. 913, 38 L. Ed. 867 (1894); *Blake v. McClung*, 172 U.S. 239, 19 S. Ct. 165, 43 L. Ed. 432 (1898); *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 28 S. Ct. 34, 52 L. Ed. 143 (1907); *Twining v. New Jersey*, 211 U.S. 78, 29 S. Ct. 14, 53 L. Ed. 97 (1908) *overruled by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *Travis v. Yale & Towne Manufacturing Co.*, 252 U.S. 60, 40 S. Ct. 228, 64 L. Ed. 460 (1920); *Hague*, 307 U.S. at 511; *Toomer v. Witsell*, 334 U.S. 385, 68 S. Ct. 1156, 92 L. Ed. 1460 (1948); *Austin v. New Hampshire*, 420 U.S. 656, 95 S. Ct. 1191, 43 L. Ed. 2d 530 (1975); *Baldwin v. Fish & Game Commission*, 436 U.S. 371, 98 S. Ct. 1852, 56 L. Ed. 2d 354 (1978); *Hicklin v. Orbeck*, 437 U.S. 518, 98 S. Ct. 2482, 57 L. Ed. 2d 397 (1978); *Supreme Court v. Piper*, 470 U.S. 274, 105 S. Ct. 1272, 84 L. Ed. 2d 205 (1985); *McBurney v. Young*, 569 U.S. 221, 133 S. Ct. 1709, 185 L. Ed. 2d 758 (2013).

Article IV, section 2 now basically "prevents a State from discriminating against citizens of other States in favor of its own."[3]  *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511, 59 S. Ct. 954, 83 L. Ed. 1423 (1939).  And since *Toomer*, states may justify discrimination against out-of-state citizens when "perfectly valid independent reasons for it" exist.  *Toomer v. Witsell*, 334 U.S. 385, 396, 68 S. Ct. 1156, 92 L. Ed. 1460 (1948) ("[T]he inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them.").  In any event, article IV, section 2 does not cover controversies arising between a state and its own citizens.  *E.g.*, *United Bldg. & Constr. Trades Council of Camden County & Vicinity v. Mayor of Camden*, 465 U.S. 208, 217, 104 S. Ct. 1020, 79 L. Ed. 2d 249 (1984) (noting in-state residents have no claim against their state government under the federal privileges and immunities clause but have

---

[3] While [*Corfield*'s] description of the civil rights of the citizens of the States has been quoted with approval,[18] it has come to be the settled view that Article IV, § 2, does not import that a citizen of one state carries with him into another fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the state first mentioned, but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy.

_____

[18] The *Slaughter-House Cases*, [83 U.S. at 75-76]; *Maxwell v. Dow*, 176 U.S. 581, 588, 591[, 20 S. Ct. 448, 44 L. Ed. 597 (1900)]; *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553, 560[, 40 S. Ct. 402, 403, 64 L. Ed. 713 (1920)].

*Hague*, 307 U.S. at 511.

a chance to remedy any in-state discrimination at the ballot box).  Federal privileges and immunities principles have transformed since *Corfield* and *Vance*, and, despite the suggestion in *Vance*, the prevailing federal doctrine no longer provides an entirely helpful analogy to the same terms in article I, section 12.  *But see Vance*, 29 Wash. at 458.  While *Corfield*'s "natural" rights interpretation now has limited application for courts interpreting the terms in the federal clauses that does not undermine its relevance in interpreting our state provision.

The majority purports "to correct the many misstatements about the history of the Fourteenth Amendment," even though *Corfield* and the cases discussed above mainly address article IV, section 2, clause 1.  *See* majority at 6-10.  Relying primarily on a law review article written by Richard Aynes, the majority declares that the United States Supreme Court incorrectly interpreted the Fourteenth Amendment's privileges and immunities clause in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L. Ed. 394 (1873).  *Id.*  The basic gist of the majority's cursory analysis reflects the view that Justice Thomas detailed in over 50 pages in *McDonald v. City of Chicago*, 561 U.S. 742, 805-58, 130 S. Ct. 3020, 177 L .Ed. 2d 894 (2010) (Thomas, J., concurring in part and concurring in the judgment); *see also Saenz v. Roe*, 526 U.S. 489, 521-28, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999) (Thomas, J., dissenting) (endorsing *Corfield* and rejecting the *Slaughter-House Cases*).  But no

Justice agreed with the view posited by Justice Thomas in *McDonald* and only Chief Justice Rehnquist did so in *Saenz.* The *McDonald* Court noted "there [is not] any consensus on [the meaning of the clause] among the scholars who agree that the *Slaughter–House Cases*' interpretation is flawed." 561 U.S. at 758 (plurality part); *see also Saenz*, 526 U.S. at 522 n.1 (Thomas, J., dissenting) ("Legal scholars agree on little beyond the conclusion that the Clause does not mean what the Court said it meant in 1873."). The Court thus "decline[d] to disturb the *Slaughter-House* holding" despite the opportunity to do so. *McDonald*, 561 U.S. at 758, 859-60 (Stevens, J. dissenting) (agreeing "the original meaning of the [privileges and immunities] Clause is not . . . clear . . . and not nearly as clear as it would need to be to dislodge 137 years of precedent").

The majority treats Aynes' law review article and *Slaughter-House Cases* dissents as precedent, while rejecting the authority of the United States Supreme Court. Though jurists, scholars, and commentators continue to vigorously debate the purpose and meaning of both federal privileges and immunities clauses, the United States Supreme Court's interpretation of the United States Constitution is binding, and the *Slaughter-House Cases* majority remains the law of the land until the Court says otherwise.

Even if we were free to disregard United States Supreme Court precedent, there is no need to pick a battle here. The majority misapprehends and mischaracterizes the view I adopt, wrongly claiming, "The dissent . . . asserts that *Corfield*'s natural rights interpretation evolved after the Civil War to favor an antidiscrimination construction, as evidenced by the *Slaughter-House Cases*, among others." Majority at 6, 10. But, it was not *Corfield* that evolved in the years following the Civil War (*Corfield* was decided over 40 years before the end of the Civil War)—it was the United States Supreme Court's view of article IV, section 2, clause 1 and the Fourteenth Amendment privileges and immunities clauses that changed. The Court has, for the most part, rejected the view espoused by Justice Washington in *Corfield*, instead favoring an antidiscrimination construction in *Paul* and the cases following.[4] Even so, *Corfield*'s fundamental, natural rights construction bears on our interpretation of our state clause, especially because its adoption in *Vance* functions to limit the privileges and immunities of Washington State citizenship to fundamental rights.

---

[4] *See generally* note 2, *supra*. *But compare Hague*, 307 U.S. at 510 (rejecting *Corfield*'s fundamental rights interpretation), *with McBurney*, 569 U.S. at 229 (quoting *Corfield*, 6 F. Cas. at 552, for the proposition that "the right to 'take, hold and dispose of property, either real or personal,' has long been seen as one of the privileges of citizenship").

Scholars observe *Corfield* construed article IV, section 2, clause 1 of the United States Constitution as "impos[ing] no limits on a state's ability to discriminate against out-of-state citizens as long as the rights or interests affected by the state's discrimination are not characterized as 'fundamental.'" *E.g.*, Martin H. Redish & Brandon Johnson, *The Underused and Overused Privileges and Immunities Clause*, 99 B.U. L. REV. 1535, 1555 (2019). "In limiting privileges and immunities of citizens of the several states, as provided for in Article IV, to 'fundamental' rights, the Court was *expanding* state legislative power by *restricting* the Constitution's restraint of that legislative power." *Id*. at 1541. "Because harvesting oysters was not deemed a 'fundamental' right, the state regulation discriminating against nonresident oyster farmers was found to be constitutionally permissible." *Id*. at 1557.

By analogy, *Vance* expanded the state's legislative power by restricting our privileges and immunities clause to pertain alone to those *fundamental rights* that belong to the citizens of the state by reason of such citizenship. *See* 29 Wash. at 458. That is why *Corfield* illuminates *Vance,* and that is why the prevailing federal doctrine no longer provides an entirely helpful analogy. The relative correctness of

the *Slaughter-House Cases* is not the reason for our departure from federal doctrine.[5] *But see* majority at 9 ("[W]e depart from the federal construction because it grew from an incorrectly decided *Slaughter-House* decision that radically changed the intent of the Fourteenth Amendment away from that of the provision's congressional authors.").

Regardless of whether *Vance* (or *Corfield*) used the notion of *fundamental rights* in a constitutional sense or in a natural law sense, the right to overtime pay cannot be deemed fundamental in either sense. The Washington Constitution does not guarantee *all* Washington citizens the right to overtime pay by reason of state citizenship, nor does any reasonable conception of Lockean natural rights.

We give a constitutional provision its common and ordinary meaning at the time our framers drafted the constitution, though interpretation may also benefit from examining the provision's historical context. *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004). In the late nineteenth and early twentieth centuries, jurists and scholars recognized "the 'privileges and immunities' belonging to a *citizen* by virtue of citizenship are 'personal' rights, that is, *private* rights, as distinguished from *public* rights." *E.g.*, W.J. Meyers, *The*

---

[5] In fact, the *Slaughter-House Cases* majority cited *Corfield* approvingly. *See* note 3, *supra*.

*Privileges and Immunities of Citizens in the Several States,* 1 MICH. L. REV. 286, 290 (1902). And we adopted this view in *Vance*, 29 Wash. at 458 (concluding article I, section 12 included the "the right[] . . . to enforce other personal rights").

Personal or

> [p]rivate rights typically included an individual's common law rights in property and bodily integrity, as well as in the enforcement of contracts. The remedy for a violation of private rights was damages measured by private loss or injunctive relief to prevent the private loss. Many saw such rights as those that "would belong to their persons merely in a state of nature."

Ann Woolhandler, *Public Rights, Private Rights, and Statutory Retroactivity*, 94 GEO. L.J. 1015, 1020 (2006) (footnotes omitted) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES *119).

Although historically non-common-law claims arising only under statute fall into the public rights category, traditional conceptions of public rights have evolved. *Id*. at 1020-21 ("The nineteenth century . . . conceived of public rights in a narrower sense, to mean claims that were owned by the government—the sovereign people as a whole—rather than in persons' individual capacities." (footnote omitted)). Public rights now enjoy "a broad connotation of constitutional or statutory claims asserted in the perceived public interest against government or regulated parties." *Id*. at 1020. And "statutory or related entitlements have some aspects of both private and public rights." *Id*. at 1021-22. We often think of statutory entitlements as belonging to

discrete individuals because the State has in some statutory schemes given individuals a remedy under statute. *Id*. at 1022. But unlike personal or private rights, statutory entitlements and benefits "originate[] with the state rather than the individual." *Id*. And we have therefore not considered rights granted only at the discretion of the legislature to be fundamental. *E.g.*, *Grant County*, 150 Wn.2d at 814.

For these reasons, "[n]ot every [statutory] benefit constitutes a 'privilege' or 'immunity' for purposes of the independent article I, section 12 analysis." *Schroeder*, 179 Wn.2d at 573. The threshold question triggering further analysis asks whether the statutory entitlement or benefit at issue encroaches on a fundamental right of state citizenship. *Schroeder*, 179 Wn.2d at 572-73. If it does not, the constitutional inquiry ends. *See, e.g.*, *Grant County*, 150 Wn.2d at 814; *Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 102-04, 178 P.3d 960 (2008). If it does encroach on such a right, though, we engage in an "independent 'privileges' analysis" under article I, section 12. *Schroeder*, 179 Wn.2d at 572 (quoting *Grant County*, 150 Wn.2d at 812-13). That involves two parts. *Id*. "First, we ask whether a challenged law grants a 'privilege' or 'immunity' for purposes of our state constitution." *Id*. at 573 (quoting *Grant County*, 150 Wn.2d at 812). "If the answer is yes, then we ask whether there is a 'reasonable ground' for granting that privilege

or immunity." *Id*. (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 731, 42 P.3d 394 (2002), *vacated in part on reh'g*, 150 Wn.2d 791).

In the superior court, the workers asserted a fundamental right of state citizenship based on article II, section 35, which directs the legislature to pass necessary laws to protect employees in jobs dangerous to life or harmful to health. While rejecting this assertion, the superior court nonetheless granted the workers partial summary judgment based on a fundamental right to work and earn a wage, including overtime. The majority affirms the superior court but based only on article II, section 35. I therefore turn first to the assertion that this constitutional provision creates a fundamental right of state citizenship with respect to protective legislation in dangerous employments.

A.     Right to Employee Protection Laws under Article II, Section 35

Article II, section 35 provides, "PROTECTION OF EMPLOYEES. The legislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same." (Boldface omitted.) This provision is not self-executing and creates no fundamental right.

Article II, section 35's plain language gives the legislature broad discretion to enact (amend or repeal) "necessary laws." It likewise gives the legislature discretion to "fix pains and penalties for the enforcement of the same." *Id*. But article II, section 35 does not grant workers in dangerous jobs particular rights under any particular statutory enactment. *See* Lebbeus J. Knapp, *The Origin of the Constitution of the State of Washington,* 4 WASH. HIST. Q. 227, 233-34 (1913) ("The constitution either provides that the legislature shall pass laws to enforce its provisions, or it expects the legislature to pass them, but . . . it is impossible for the constitution to dictate what laws the future legislatures may pass."). The legislature has plenary power to determine what "laws" are "necessary" to protect people working in these jobs. *See, e.g.*, *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 300-01, 174 P.3d 1142 (2007) (stating the legislature has plenary power to enact laws not prohibited by the state or federal constitutions).

In 1973, "in keeping with the mandates of [a]rticle II, section 35 of the state Constitution," the legislature enacted the Washington Industrial Safety and Health Act (WISHA), ch. 49.17 RCW. RCW 49.17.010; LAWS OF 1973, ch. 80 § 1. WISHA aims to "to assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington, [and] the legislature in the exercise of its police power . . . declares its purpose . . .

to create, maintain, continue, and enhance the industrial safety and health program of the state." RCW 49.17.010. Consistent with its statutory framework, the Washington Department of Labor and Industries has promulgated many health and safety regulations specifically related to farmworkers. *See generally* ch. 296-307 WAC (safety standards for agriculture). The legislature thus met its article II, section 35 duty to "pass necessary laws" with this enactment. *See generally* WASH. CONST. art. II, § 35; ch. 49.17 RCW. But its actions do not elevate specific statutory measures to constitutional rights.

Our case law confirms article II, section 35 does not create a fundamental right of state citizenship given legislative discretion on worker health and safety law. In *Ventenbergs*, a waste hauler sued the city of Seattle and others, arguing that by granting contracts exclusively to two other waste haulers, the city violated our state privileges and immunities clause. 163 Wn.2d at 102. Ventenbergs claimed that the ""right to hold specific private employment"" is a fundamental right of citizenship." *Id*. at 103 (quoting court papers (quoting *Plumbers & Steamfitters Union Local 598 v. Wash. Pub. Power Supply Sys.*, 44 Wn. App. 906, 915, 724 P.2d 1030 (1986))). We determined, however, "[t]he type of employment that Ventenbergs seeks is not private—it is in a realm belonging to the State and delegated to local governments." *Id*. Relying on *Grant County*, we held Ventenbergs had no fundamental right of

citizenship to engage in municipal solid waste collection services because the constitutional power to regulate this governmental service lies with the legislature and local governments. *Id*. at 103-04.

*Grant County* arose from consolidated cases presenting article I, section 12 challenges to the petition method for property annexation. 150 Wn.2d at 797-98. There, we similarly determined:

> The statutory authorization to landowners to commence annexation proceedings by petition does not involve a fundamental attribute of an individual's national or state citizenship. Instead, the *legislature* enjoys plenary power to adjust the boundaries of municipal corporations and may authorize annexation without the consent of the residents and even over their express protest.

*Id.* at 813. For these reasons, we held, "there is no privilege, i.e., fundamental right of state citizenship, at issue in this case, and the claim of a violation of article I, section 12 [thus] fails." *Id*. at 814.

The case before us today is like *Ventenbergs* and *Grant County*. Under the umbrella of its police power, the legislature has plenary power to enact, amend, or repeal laws it considers necessary (or unnecessary) to protect employees in jobs dangerous to life or harmful to health. *See Ventenbergs*, 163 Wn.2d at 102; *Grant County*, 150 Wn.2d at 813-14; *see also Ockletree v. Franciscan Health Sys.*, 179 Wn.2d 769, 795, 317 P.3d 1009 (2014) (plurality opinion) (Stephens, J., dissenting) ("[T]he legislature has authority to create or repeal causes of action unrelated to

common law claims, and it does not grant or withhold a privilege when it does so."

(citing *Atchison v. Great W. Malting Co.*, 161 Wn.2d 372, 381, 166 P.3d 662

(2007))).  If the legislature repealed the overtime statute during the next legislative

session, no Washington citizen would have a personal or private common-law right

to insist on overtime pay—absent an employment contract with a term promising the

same.  *See* Woolhandler, *supra*, at 1020 ("Private rights typically included an

individual's common law rights in property and bodily integrity, as well as in the

enforcement of contracts.").

Despite our views on the benefits of overtime pay, we must recognize there is

no constitutional mandate, as the overtime statute "does not involve a fundamental

attribute of an individual's national or state citizenship" under article I, section 12.[6]

*See, e.g.*, *Grant County*, 150 Wn.2d at 813-14.

---

[6] Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."  If overtime pay is truly a fundamental right—i.e., a privilege Washingtonians enjoy by reason of state citizenship—no law shall be passed granting any citizen overtime pay that does not belong on equal terms to *all* Washington citizens or corporations.  In other words, we must accept that all exemptions that encroach on the alleged fundamental right to overtime pay are presumptively unconstitutional (unless reasonable grounds exist).  *See generally* RCW 49.46.130(2)(a)-(j).  That article II, section 35 protects only employees in jobs dangerous to life or harmful to health—and does not apply equally to all Washington citizens—further undermines the majority's characterization of overtime pay as a fundamental right of state citizenship.

The history of article II, section 35 provides some further insight:

> [Article II, section 35] was taken from the constitutions of Colorado and Illinois. As a corollary to restrictions on corporations, particularly in Article XII, the convention sought to provide for the protection of labor. During the time preceding the convention there had been violent disturbances at mining camps in Roslyn and Newcastle when mining companies hired armed guards to attack striking miners. The working conditions at some industrial concerns in the territory were notoriously dangerous, and organized labor lobbied for a constitutional provision requiring the legislature to enact health and safety laws.

ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 82 (2d ed. 2013) (citations omitted). The framers' historical objective of protecting employee health and safety thus reflects the establishment of a constitutional safeguard in the form of a *public* right to laws protecting the same. This does not amount to a privately enforceable fundamental right to such laws. *But see* majority at 9-10 (holding article II, section 35 creates a personal or private right).

Still more, the structure of the constitution shows that article II, section 35 does not create the sort of personal or private right that existed at common law. Article I—the declaration of rights—contains several examples of personal or private fundamental civil rights and liberties citizens enjoyed at common law (e.g., the right to life, liberty and property, due process, protection from discrimination, the right to petition and assembly, and the freedom of speech and religion). Article II, in contrast, governs the legislative department, recognizing, guiding, or

restraining its plenary power to enact laws. The framers' placement of the directive for employee protection legislation in article II, rather than article I, provides added evidence of the intent to grant the legislature full discretion over worker health and safety laws. And we have not considered statutory benefits granted only at the discretion of the legislature to be fundamental. *Grant County*, 150 Wn.2d at 814. Indeed, to do so would constitutionalize all protective legislation and wrongly suggest that anytime the legislature limits the scope of protective legislation in employment, it implicates article I, section 12.[7]

I would hold the provision for employee protection laws in article II, section 35 does not create a fundamental right of state citizenship to overtime pay under article I, section 12.

---

[7] The majority seems to conclude that *whenever* the legislature passes legislation that has the effect of protecting employees in jobs dangerous to life or harmful to health, article II, section 35 automatically entitles workers to such protections. *See* majority at 13 n.3. But in doing so, the majority renders critical constitutional language meaningless. The majority is correct that article II, section 35 imposes a duty on the legislature to "pass *necessary* laws" to protect employees in such jobs. By implication, the legislature determined overtime pay is not "necessary" to protect the health and safety of agricultural workers. Article II, section 35 gives the legislature broad discretion to make these types of policy determinations—it does not give this court discretion to determine which laws are "necessary." "'We are not a super legislature.'" *Davison v. State*, No. 96766-1, slip op. at 11 (Wash. June 25, 2020), https://www.courts.wa.gov/opinions/pdf/967661.pdf (quoting *Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n*, 83 Wn.2d 523, 528, 520 P.2d 162 (1974)).

B.    The Right To Work and Earn a Wage

Even though the workers did not argue below that they have a fundamental right of state citizenship to work and earn a wage, the superior court granted summary judgment in their favor on this basis, ruling sua sponte that they enjoy such a fundamental right, which includes the right to overtime pay.  The majority does not endorse this argument because it affirms the summary judgment order on other grounds.  I would reject it.  We have never recognized the right to work and earn a wage as a fundamental right of state citizenship under article I, section 12.  And in the context of this case, reliance on such a right is a non sequitur because the question below and on review involves only whether the workers have a fundamental right to overtime pay.

Under federal law, "the Privileges and Immunities Clause protects the right of citizens to 'ply their trade, practice their occupation, or pursue a common calling.'" *McBurney v. Young*, 569 U.S. 221, 227, 133 S. Ct. 1709, 185 L. Ed. 2d 758 (2013) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 524, 98 S. Ct. 2482, 57 L. Ed. 2d 397 (1978)); *see also In re Aubrey*, 36 Wash. 308, 315, 78 P. 900 (1904) (the right to choose a trade or profession is likewise constitutionally protected under the banner of liberty).  "[T]he right to 'take, hold and dispose of property, either real or personal,' has long been seen as one of the privileges of citizenship." *McBurney*,

569 U.S. at 229 (quoting *Corfield*, 6 F. Cas. at 552). Washingtonians equally have "the [fundamental] right, by usual modes, to acquire and hold property, and to protect and defend the same in the law." *Vance*, 29 Wash. at 458.

Property takes many forms. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "Money is property." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 398, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000) (Stevens, J., concurring); *see also State v. Wilder*, 12 Wn. App. 296, 299, 529 P.2d 1109 (1974) ("Money is property."). We have also construed wages and income as property. *See, e.g.*, *Kitsap County Deputy Sheriffs' Guild v. Kitsap County*, 183 Wn.2d 358, 353 P.3d 188 (2015) (plurality opinion) (generally discussing wages as property); *Culliton v. Chase*, 174 Wash. 363, 375-76, 25 P.2d 81 (1933) (construing income is "property" under amendment 14 of the state constitution). Most of us acquire money, income, and wages by working. It therefore stands to reason that Washingtonians have a fundamental common law right to work and earn a wage and to protect and defend the product of their labor in the courts. *See Vance*, 29 Wash. at 458.

At the same time, the Constitution does not itself create property rights or interests. *Bd. of Regents*, 408 U.S. at 577. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an

independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Any claim of entitlement must be "grounded in the statute [or other instrument] defining eligibility for" the property interest. *See id.* (recognizing welfare recipients' property interests were created and defined by statute while a professor's property interest was created and defined by the terms of his employment contract). But not every benefit created by the legislature embodies "a 'privilege' or 'immunity' for purposes of the independent article I, section 12 analysis." *Schroeder*, 179 Wn.2d at 573. "A property interest in a benefit exists [only] if a person has a 'legitimate claim of entitlement to it.'" *Kitsap County*, 183 Wn.2d at 362 (quoting *Bd. of Regents*, 408 U.S. at 577). "A mere 'abstract need or desire' or 'a unilateral expectation' of the benefit is insufficient to create a property interest." *Id.* (quoting *Bd. of Regents,* 408 U.S. at 577*).* Here, for various policy reasons, the legislature exempted agricultural workers from the overtime statute, and so they have no property interest in this benefit. Because the workers have no property interest in or right to overtime pay, the statutory exemption from overtime does not encroach on their fundamental right to acquire and hold property (i.e., the right to work and earn a wage). *See Vance*, 29 Wash. at 458.

This conclusion follows from recognition that the right to overtime pay in RCW 49.46.130(1) represents a discretionary exercise of the legislature's police power, not a fundamental right. *See* RCW 49.46.005 (declaration of police power); *see also Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 362, 340 P.3d 849 (2015) (concluding the right to sell and distribute spirits is not a fundamental right of state citizenship because it is granted only at the discretion of the legislature under its police power). Indeed, overtime pay is a statutory benefit granted as a matter of grace by the state. *See Ass'n of Wash. Spirits*, 182 Wn.2d 342 ("'[T]he distinction between a lawful business which a citizen has the right to engage in and one in which he may engage only as a matter of grace of the state' must be considered." (quoting *Randles v. Wash. State Liquor Control Bd.*, 33 Wn.2d 688, 694, 206 P.2d 1209 (1949))). So, for purposes of article I, section 12's analysis, even acknowledging the general right to pursue a common calling and, as a corollary, the fundamental right to work and earn a wage, statutorily exempted workers do not enjoy a fundamental right to overtime pay.

In sum, I would hold that the agricultural exemption from overtime pay does not confer a privilege or immunity under article I, section 12 because no fundamental right is at issue. Article II, section 35 does not embody a fundamental right, as the legislature may determine what laws it deems "necessary" to protect workers in

-25-

dangerous employments. And although the general right to work and earn a wage exists, that property right does not bring all statutory benefits enacted in the context of employment within its ambit. Because we engage in an independent privileges and immunities analysis only when a law encroaches on a fundamental right of state citizenship, the court need not inquire further. *See, e.g.*, *Grant County*, 150 Wn.2d at 814; *Ventenbergs*, 163 Wn.2d at 102-04. There is no need to consider whether the legislative exemption rests on reasonable grounds, as it does not implicate the privileges and immunities clause at all.

### III. EQUAL PROTECTION

The workers also contend agricultural exemption violates the state equal protection clause under any level of scrutiny, though they urge us to apply strict scrutiny. The concurrence would accept the workers' argument, applying intermediate scrutiny. I believe it is unsustainable under our precedent. I would hold rational basis review applies here and conclude that the statutory overtime exemption does not violate article I, section 12 on state equal protection grounds.

I recognize it is of no solace to these workers that "Washington has a 'long and proud history of being a pioneer in the protection of employee rights.'" *Hill v. Xerox Bus. Servs., LLC*, 191 Wn.2d 751, 760, 426 P.3d 703 (2018) (internal quotation marks omitted) (quoting *Int'l Ass'n of Fire Fighters, Local 46 v. City of*

*Everett*, 146 Wn.2d 29, 35, 42 P.3d 1265 (2002)). We were "one of the first states to enact a statewide minimum wage for women and minors." *Id.* Despite our progressive history in the context of employee rights, we have upheld legislative distinctions between different classes of workers. *Compare Carranza v. Dovex Fruit Co.*, 190 Wn.2d 612, 416 P.3d 1205 (2018) (holding agricultural employers must pay their piece-rate employees separate hourly compensation for time spent on tasks outside piece-rate picking work), *with Sampson v. Knight Transp.*, *Inc.*, 193 Wn.2d 878, 448 P.3d 9 (2019) (holding nonagricultural employers need not pay their piece-rate employees hourly compensation for time spent on tasks outside piece-rate work).

Equal protection requires similarly situated individuals receive similar treatment under the law. *See* U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 12. It does not require "complete equality among individuals or classes of individuals." *Harris v. Charles*, 171 Wn.2d 455, 462, 256 P.3d 328 (2011). To determine whether a law violates the state or federal equal protection clause, we use one of three tests: strict scrutiny, intermediate scrutiny, or rational basis review. *Id.* (quoting *State v. Harner*, 153 Wn.2d 228, 235-36, 103 P.3d 738 (2004)) "[T]he appropriate level of scrutiny depends on the nature of the classification or rights involved." *Am. Legion Post No.149*, 164 Wn.2d at 608.

Strict scrutiny applies to suspect classifications and laws burdening fundamental rights or liberties. *Id*. at 608-09. "Race, alienage, and national origin are examples of suspect classifications." *Id*. We apply intermediate scrutiny when the law at issue involves "'both an important right and a semi-suspect class not accountable for its status.'" *Id*. at 609 (internal quotation marks omitted) (quoting *Madison v. State*, 161 Wn.2d 85, 103, 163 P.3d 757 (2007) (plurality opinion)). Gender and poverty based classifications are examples of semisuspect classes. *Westerman v. Cary*, 125 Wn.2d 277, 294, 892 P.2d 1067 (1994); *compare State v. Schaaf*, 109 Wn.2d 1, 19, 743 P.2d 240 (1987) (holding children form neither a suspect nor semisuspect class for equal protection purposes), *with Schroeder*, 179 Wn.2d at 577-79 (concluding some classes of children, e.g., foster children, may constitute a semisuspect class). "Absent a fundamental right or suspect class, or an important right [and] semisuspect class, a law will receive rational basis review." *State v. Hirschfelder*, 170 Wn.2d 536, 550, 242 P.3d 876 (2010).

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970). A classification will survive rational basis review "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct.

1620, 134 L. Ed. 2d 855 (1996). We presume social and economic legislation is rational when it does not involve a suspect class or fundamental right, though "this presumption may be overcome by a clear showing that the law is arbitrary and irrational." *Am. Legion Post No. 149*, 164 Wn.2d at 609. Under rational basis review, we evaluate whether (1) "'all members of the class are treated alike,'" (2) "'there is a rational basis for treating differently those within and without the class,'" and (3) "'the classification is rationally related to the purpose of the legislation.'" *Id*. (quoting *O'Hartigan v. Dep't of Pers*., 118 Wn.2d 111, 122, 821 P.2d 44 (1991)).

We "'may assume the existence of any conceivable state of facts that could provide a rational basis for the classification.'" *Id*. (quoting *Andersen v. King County*, 158 Wn.2d 1, 31, 138 P.3d 963 (2006) (plurality opinion), *overruled on other grounds by Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)). Equal protection does not require "'all evils of the same genus be eradicated or none at all.'" *Id*. at 609-10 (quoting *O'Hartigan*, 118 Wn.2d at 124). And the government may pursue its desired ends "one step at a time." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 99 L. Ed. 563 (1955). That legislation may be over- or underinclusive with respect to its purported end is beside the point: "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and

ends." *Heller v. Doe*, 509 U.S. 312, 321, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).

This is true even when a classification "'results in some inequality.'" *Id.* (internal

quotation marks omitted) (quoting *Dandridge*, 397 U.S. at 485). Such has long been

the history of judicial review of economic and social welfare legislation.

The workers argue the agricultural exemption from the statutory benefit of

overtime pay impermissibly discriminates based on race and is therefore subject to

strict scrutiny. Recognizing the exemption is facially neutral, they point us to

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.

Ct. 555, 50 L. Ed. 2d 450 (1977) ("Sometimes a clear pattern, unexplainable on

grounds other than race, emerges from the effect of the state action even when the

governing legislation appears neutral on its face."). They urge us to conclude that

racial bias motivated the legislature's enactment of the agricultural exemption and

that there is a clear pattern of discrimination against Latinx farmworkers

unexplainable on grounds other than race. To support their argument, the workers

offer evidence showing the agricultural exemption currently has a disparate impact

on Latinx farmworkers, evidence disputed by DeRuyter.

I believe our decision in *Macias v. Department of Labor & Industries*, 100

Wn.2d 263, 668 P.2d 1278 (1983) controls. There, several migrant Latinx

farmworkers challenged the constitutionality of their exclusion from workers'

compensation benefits on equal protection grounds. *Id*. at 264, 269. Relevant here, they argued that the statute impermissibly discriminated based on race thus triggering strict scrutiny. *Id*. at 269. They introduced statistical evidence of disparate impact, alleging 73 percent of the individuals affected were Latinx, but no evidence of purposeful discrimination or intent. *Id*. at 269-71. This court rejected their claim. *Id*. at 271. Relying on *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976), we held "statistics alone will not trigger strict scrutiny, unless there is some evidence of purposeful discrimination or intent." *Macias*, 100 Wn.2d at 270.

The workers here try to distinguish *Macias*, arguing this case exemplifies a "dramatic impact" warranting strict scrutiny because they allege almost 100 percent of Washington farmworkers are now Latinx. In *Macias*, 100 Wn.2d at 270-71, we distinguished two cases involving the kind of "dramatic impact" required to warrant strict scrutiny: *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) and *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960). But these cases do not support the workers' claim here.

In *Yick Wo*, a San Francisco ordinance required all laundries to hold a permit. Over 200 applicants of Chinese descent sought a permit, but all were denied; at the same time, 80 others—not of Chinese descent—were permitted to carry on the same laundry business under similar conditions. 118 U.S. at 374. Yick Wo and Wo Lee

each operated laundry businesses without a permit and were imprisoned after refusing to pay a fine. *See generally id*. They sued, arguing the fine and the ordinance's discriminatory enforcement violated the Fourteenth Amendment's equal protection clause. *Id*. The Court announced an important principle of equal protection: even if a law is facially neutral, "if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." *Id*. at 373-74. The Court determined the biased enforcement the plaintiffs experienced amounted to "a practical denial by the State of that equal protection of the laws" and thus violated the equal protection clause. *Id*. at 373.

In *Gomillion,* the Alabama State Legislature redrew the city lines defining Tuskegee, Alabama. 364 U.S. at 340. Before the revision the city lines formed a square shape. *Id*. But after, the city lines formed a "strangely irregular twenty-eight-sided figure." *Id*. at 341. The redrawing had the effect of removing all the city's 400 African-American voters (except four or five) from the city. *Id*. On the other hand, the redrawing did not remove a single white voter. *Id*. A group of African-American voters challenged the legislation, arguing the law violated the Fourteenth Amendment's equal protection clause, among other things. *Id*. The majority did not

reach the equal protection claim, though. *See generally id.* Instead, the Court held, "When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment." *Id.* at 346. Still, a concurring justice opined, "It seems to me that the decision should be rested not on the Fifteenth Amendment, but rather on the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *Id.* at 349 (Whittaker, J., concurring).

Based on the record before us, this case does not present a situation as stark as *Yick Wo* or *Gomillion*. These cases did not merely involve statutory schemes with a "dramatic impact" on a racial minority—they reeked of racial animus. The United States Supreme Court has noted cases relying on disparate impact should be "rare." *Village of Arlington Heights*, 429 U.S. at 266 ("Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative."). Even accepting the workers' statistics as correct (though on summary judgment we must view the evidence in the light most favorable to DeRuyter), there is no evidence showing the Washington legislature had any discriminatory purpose or intent in enacting the overtime exemption. The workers argue that racial animus drove *Congress* to include the agricultural exemption in the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219, and Washington law is based on FLSA. But this historical

link provides insufficient grounds to conclude (as a matter of law, no less) that *our* legislature enacted the MWA's agricultural exemption with discriminatory purpose or intent. Although the evidence presented appears to show the demographics of agricultural workers in Washington have changed since the MWA's enactment, the parties' dispute this evidence and genuine issues of material fact on this question exist. That said, we need not accept or reject the evidence showing a disparate statistical impact because it is constitutionally insufficient. *See Macias*, 100 Wn.2d 269-71.

As a fallback position, the workers argue we should apply intermediate scrutiny on the premise that overtime pay is an important right and the workers are a semisuspect class. They rely on *Schroeder*, where this court held that "a 'privilege' for purposes of the article I, section 12 reasonable ground analysis . . . is undeniably 'important' for purposes of our state equal protection analysis." 179 Wn.2d at 538. True enough, but as explained above, the statutory provision for overtime pay is not a fundamental right of state citizenship. It is a statutory benefit granted only at the discretion of the legislature. *See Grant County*, 150 Wn.2d at 814. Overtime pay does not constitute an important right for the purposes of equal protection scrutiny. *Compare Madison*, 161 Wn.2d at 103 (felons' right to vote is not an important right), *and Seeley v. State*, 132 Wn.2d 776, 795, 940 P.2d 604 (1997) (use of certain drugs,

like marijuana, as a treatment for a cancer is not an important right), *with State v. Manussier*, 129 Wn.2d 652, 673-74, 921 P.2d 473 (1996) (physical liberty is an important right), *and Griffin v. Eller*, 130 Wn.2d 58, 65, 922 P.2d 788 (1996) (freedom from discrimination is an important right). Because intermediate scrutiny applies only when a case involves both a semisuspect class *and* an important right, I would decline to apply intermediate scrutiny.

The application of intermediate scrutiny in the concurrence rests on identifying agricultural workers as a vulnerable class. This analysis would cause a tectonic shift in federal and state equal protection jurisprudence. The equal protection doctrine has long recognized that governments can make incremental decisions about social and economic policy "one step at a time." *Williamson*, 348 U.S. at 489. Showing that farmworkers generally, or the class of dairy workers here, have been treated unfavorably in protective legislation does not make them a vulnerable class for purposes of heightened equal protection scrutiny. The concurrence, at 7-8, analogizes to cases involving children, yet neglects to show how agricultural workers are similarly situated and ignores the long line of cases refusing to categorize as vulnerable various classes of disadvantaged adults. *See, e.g.*, *Manussier*, 129 Wn.2d at 673-74 (prisoners convicted under "three strikes" law do not constitute a suspect or semisuspect class); *State v. Osman*, 157 Wn.2d 474, 485,

139 P.3d 334 (2006) ("Illegal aliens are not members of a suspect class and courts have consistently subjected restrictions of their rights to rational basis review." (citing *Plyler v. Doe*, 457 U.S. 202, 219 n. 19, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982))); *Seeley*, 132 Wn.2d at 795 (cancer patients are not a semisuspect class); *Griffin*, 130 Wn.2d at 65 (class of small employers exempt from the Washington Law Against Discrimination, ch. 49.60 RCW, or persons employed by them, is neither suspect nor semisuspect). Under long-standing precedent, intermediate scrutiny does not apply to the statutory overtime exemption.

Because overtime statutes constitute economic legislation, traditional rational basis review applies. Our equal protection inquiry therefore begins with the presumption that the legislature's decision to enact social or economic protective legislation subject to certain exemptions is rational. *See Am. Legion Post No. 149*, 164 Wn.2d at 609. I would hold the agricultural exemption survives the workers' equal protection challenge under rational basis review.

First, the legislature exempted all agricultural workers from overtime pay and thus treated these similarly situated workers alike. Second, agricultural work, which is often seasonal or requires focused efforts to harvest products quickly, provides a rational basis for treating agricultural workers differently from those outside the class. Third, the legislature enacted ch. 49.46 RCW, which governs minimum wage

requirements and labor standards, "for the purpose of protecting the immediate and future health, safety and welfare of the people of this state." RCW 49.46.005(1).[8] "[T]he legislature endeavors . . . to establish a minimum wage for employees of this state to encourage employment opportunities within the state." *Id.* We must therefore consider that the legislation serves policy concerns beyond direct employee protection and may limit some protections to promote other public welfare values.

Applying rational basis review, the legislature could have rationally concluded that lower operation costs may decrease the overall cost of agricultural commodities and these benefits may be passed on to Washington consumers.[9] The legislature's police power provides broad discretionary authority over this kind of social and economic policy. *See Fed. Commc'ns, Comm'n. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-20, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). Because the agricultural exemption is rationally related to legitimate governmental policy, I

---

[8] "Since the enactment of Washington's original minimum wage act, the legislature and the people have repeatedly amended [chapter 49.46 RCW] to establish and enforce modern fair labor standards, including periodically updating . . . the right to overtime pay." RCW 49.46.005(2).

[9] Unlike our reasonable grounds standard, which "does not permit us to hypothesize facts," *Schroeder*, 179 Wn.2d at 575, the legislature need not articulate the purpose or rationale supporting its classification under rational basis review. *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). "In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.*

would hold RCW 49.46.130(2)(g) does not violate article I, section 12 on state equal protection grounds.

CONCLUSION

I would hold the agricultural exemption does not violate article I, section 12 on legislative favoritism grounds or equal protection grounds. I would reverse the partial grant of summary judgment to the workers and remand for entry of summary judgment in DeRuyter's favor. Based on this resolution, I would also deny the workers' attorney fee request.

_____
Stephens, C.J.

_____
Owens, J.

_____
Johnson, J.

_____
Fairhurst, J.P.T.

*Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*

No. 96267-7

JOHNSON, J. (separate dissent)—I write separately to address the separate, equitable argument raised whether to apply the court's holding prospectively only. Based on the majority's holding and the circumstances of this case, principles of fairness and equity require prospective application.[1]

While a presumption exists that generally a decision applies retroactively, cases recognize a court in equity may apply a decision prospectively to only future cases. *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 271, 208 P.3d 1092 (2009). Although prospective application is rare, it is nonetheless warranted where we find retroactive application is inequitable. *See McDevitt v. Harborview Med.*

---

[1] The *petitioners* argue that retroactive application was not an issue properly before the court. Pet'rs' Reply and Resp. to Cross-Appeal at 40-41. But DeRuyter explicitly argued this point in its briefing. Opening Br. of Resp'ts/Cross-Appellants at 44-49. Prospective application is an argument that arises only from the invalidation of the statutory exemption and can be resolved only by this court. *See Lunsford v. Saberhagen Holdings, Inc.,* 166 Wn.2d 264, 279, 208 P.3d 1092 (2009) ("By its very nature, the decision to apply a new rule prospectively must be made in the decision announcing the new rule of law. It is at that point—when we are engaged in weighing the relative harms of affirming or overruling precedent—that courts are in the best position to determine whether a new rule should apply retroactively or prospectively only.").

*Ctr.,* 179 Wn.2d 59, 75-76, 316 P.3d 469 (2013) (plurality opinion). In our cases, we have sometimes applied three factors developed in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971), when considering the equities of retroactive application, asking whether "'(1) the decision established a new rule of law that either overruled clear precedent upon which the parties relied or was not clearly foreshadowed, (2) retroactive application would tend to impede the policy objectives of the new rule, and (3) retroactive application would produce a substantially inequitable result.'" *McDevitt,* 179 Wn.2d at 75 (quoting *Lunsford*, 166 Wn.2d at 272).

In applying those factors, I would find first the majority's decision in this case invalidates an exemption that has been the law and been relied on for more than 60 years. The presumptive constitutionality of this law led farm employers to rely on and follow the statutory wage requirements, and they should not be punished for that reliance. Moreover, no case during the past 60 years questioned the exemption's validity. Farm employers had no reason to foresee the need to change their practice of not paying overtime. Creating a liability would be inequitable to the farm employers here.

Additionally, regarding the third factor, retroactive application of this decision could produce a substantially inequitable result for many farm employers. Applying a decision prospectively only is "a logical and integral part of stare

decisis by enabling the courts to right a wrong without doing more injustice than is sought to be corrected." *State ex rel. Wash. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 666, 384 P.2d 833 (1963). The cost of paying overtime for hours worked in the past could have a devastating impact on farm employers broadly. The far-reaching impact of retroactive application inflicts more injustice than is necessary to give effect to the decision. No expectation of overtime pay existed when farm employees entered into employment contracts. Plus, the primary goal in this case from the employees' perspective is invalidation of the exemption, which the majority grants. Based on the majority's ruling, farm workers will now be entitled to future overtime pay, a substantial benefit. So, while some inequity to workers exists by prospective application, this inequity is tempered by the future benefits created under the majority's holding. Thus, applying today's decision only prospectively does not undermine the benefit to farm employees of invalidating the exemption.

Farm employers should not bear the overwhelming risk of financial devastation because they paid what the law required of them at the time. The balancing of the equities in this case requires the court to apply today's decision only prospectively to future cases.

_____
Johnson, J.

_____
Stephens, C.J.

_____
Fairhurst, J.P.T.

_____
Owens, J.

*Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, No. 96267-7
(Johnson, J., separate dissent)

4